## Case No. 10,548.

OPEN BOAT.

THREE PUNCHEONS OF RUM.

[1 Ware (26) 18.] [1]

District Court, D. Maine. June Term, 1823.

TREATY OF GHENT—ISLAND OF POPE'S FOLLY—JURISDICTION OF UNITED STATES.

1. A case arising upon the construction of the decision of the commissioners under the fourth article of the treaty of Ghent.

2. The small island called Pope's Folly, in the Bay of Passamaquoddy, is within the jurisdiction of the United States.

These two cases. arising out of the same facts, and involving the same principles of law, were considered and argued together as one case.

Dist. Atty. Shepley, for United States.
Mr. Longfellow, for claimant.

WARE, District Judge. These two cases, growing out of the same transactions, and depending on the same facts, have been argued together as one case, nor do I see any cause for making a distinction between them. Upon the evidence which has been

---

[1] [Reprinted by permission.]

[1] [Reported by Hon. Ashur Ware, District Judge.]

produced the decision of one must determine the fate of the other.

The history of the case, as it comes from the witnesses, is shortly this. A few days before the seizure was made, an English vessel called the Ocean, of which the claimant, Capt. Ricker, was master, arrived in the Bay of Passamaquoddy, with a cargo of from forty to fifty puncheons of rum. Where she was from does not appear, but it is suggested by some of the witnesses that the rum, having been imported into the neighboring province. subject to a duty there, but entitled to a drawback on its re-exportation, the object of the owner was to obtain this drawback by a pretended exportation to the United States, and then smuggle it back into Campobello. In pursuance of this plan, or whatever may have been the real destination of the cargo, the Ocean came to anchor a little to the south-eastward of a small island known by the name of Pope's Folly, situated between Frederick Island and Campobello, and in a line drawn from the eastern shore of Lubec at low water to Dudley Island. While she remained in that situation the rum was unladen, and put on board of an American vessel, the Atlantic, Capt. Richardson, master. The Atlantic remained with the rum on board in the place where she received it, three or four days, taking in a cargo of gypsum, when, having completed her cargo and got ready for sea, and the rum remaining on board undisposed of, it became necessary to remove it again, and it was transferred to the Commerce, Capt. Drinkwater. The Commerce, soon after the rum was put on board, moved up and came to anchor to the northward of Pope's Folly. She having completed her cargo in three or four days, and being ready to sail, it became necessary again to make some provision for the rum. Twenty puncheons were landed on Campobello, and put into Mr. McLain's store, and in the following night, eight were put on board the open boat in question, which, in the morning, was seized, with the rum in it, to the south-eastward of this island. The Commerce drifted during the night, and the three puncheons were seized in her, in the morning, while lying south-westerly from Frederick Island. All these transfers of the rum, from vessel to vessel, were made while the vessels were lying near to Pope's Folly, and nearer to that than to any other land.

If these transactions took place while the vessels were lying within the waters of the United States, there cannot be a doubt that a forfeiture attaches, under the 50th section of the collection act of March 2, 1799 [1 Stat. 665]. The law annexes the forfeiture to every unlading of goods brought from a foreign port, without a permit from the collector, whatever may be the pretext. Where the law has made no exception, the court can make none. Admitting, therefore, the object to have been, what was suggested by some of the witnesses, and insisted upon at the

argument, not to land the goods in the United States, but to smuggle them into Campobello, in fraud of the British revenue laws, this intention, if fully proved, would not withdraw them from the forfeiture annexed to the act by our law. If it be true, as argued by the counsel for the claimant, that the courts of this country will not lend their powers to enforce the revenue laws of a foreign country, and this is admitted to be in conformity with the usage of all nations, it is equally true, that if foreigners choose their station within our territory, from which to commit frauds upon their own government, they must take care, at least, so to manage their business as not to violate our laws. The common practice of commercial nations, not only to connive at the frauds committed by their subjects upon the revenue laws of other countries, but even indirectly to favor them, has been carried quite as far as is consistent with a wise policy; for a wise policy cannot often be in opposition to an honest one, and it has been carried somewhat further than can be vindicated on any principles of sound morality. Pothier, Traitè Des Assurances, No. 58. The argument, however, would require this court to go one step further on this questionable ground than any court has yet gone, and that is, to admit the avowed intention of violating the revenue laws of a neighboring and friendly nation, as an excuse for violating our own.

The whole case turns upon a single fact, whether the unlading alleged in the libel, took place within the waters of the United States, or not; whether it was upon the American or British side of the jurisdictional line; and this depends upon another, and that is, whether the small island called Pope's Folly, in the vicinity of which the unlading took place, belongs to the United States or to Great Britain. The acts complained of as the ground of forfeiture, were done near this island, and much nearer to it than to the island of Campobello. Assuming that it belongs to the United States, and it will follow, from the well-established principles of the laws of nations, that the right of exclusive jurisdiction extends to the middle of the channel, at low water, between the two islands. The whole of the waters are common to both nations for the purposes of navigation, as a common highway, but the exclusive rights of the two nations meet in the centre or thread of the channel. Kirkland v. The Fame [Case No. 7,845]. The laws of each country extend in their full vigor up to this line, without leaving, as seems to have been imagined by persons in the habit of trading in that quarter, a space or belt of neutral ground, where the laws of both countries may be set at defiance.

It is contended by the counsel for the claimant, that whatever claims the United States might formerly have had to this island, the decision of the commissioners under the fourth article of the treaty of Ghent

has finally and definitively established it as belonging to Great Britain. The terms used by the commissioners are, it must be admitted, sufficiently comprehensive to support this position. In their report, they say that they "have decided, and do decide, that Moose Island, Dudley Island, and Frederick Island do, and each of them does, belong to the United States; and that all the other islands, and each and every of them, in the Bay of Passamaquoddy, do belong to his Britannic majesty." This is undoubtedly language of the most comprehensive import, and as this island is situated in the Bay of Passamaquoddy, and is not one of the islands named as belonging to the United States, if there is no principle of interpretation by which the universality of the words can be limited in their operation, the island in question must clearly belong to Great Britain. But there are insuperable objections to taking the language of the commissioners in its largest signification. It would give to their decision an operation which cannot be supposed to have been intended. This will be apparent by adverting to the topography of the bay, and the islands within it. The three islands, named in the decision as belonging to the United States, namely, Moose Island, Frederick Island, and Dudley Island, lie nearly in a right line drawn from the south-eastern extremity of the town of Perry, on the right bank of the Schoodiac, to Lubec Point and West Quoddy Head. Between these islands and the American shore, there are a number of small islands, some of them inhabited, and several lying close to the shore of the main land. Our title to these has never, at any stage of the controversy, been called in question. If we are to give to the words of the commissioners their most extensive operation, all these islands must be assigned to Great Britain, and the consequence will be that, while the United States possess Moose, Frederick, and Dudley Islands, in front, Great Britain will possess six or seven small islands, in the rear, situated between them and the main land of the American shore. Such cannot reasonably be supposed to have been the intention of the commissioners. Some principle of interpretation must be adopted, that will not involve so glaring an absurdity, and one fraught with so much inconvenience to both parties.

By taking into view the state of the controversy between the two countries respecting the title to the islands in the Bay of Passamaquoddy, as it stood at the time of the decision of the commissioners, a key will be found to an interpretation of their report, consistent with the interests of both parties. The dispute commenced at a very early period after the peace of 1783. The British claimed all the islands in the bay, as being originally a part of the province of Nova Scotia, while the line claimed on the part of the United States, would include a

large part, if not all of them, within our limits. In the process of the controversy, the debatable ground was narrowed down principally to four islands, namely, to Moose, Frederick, and Dudley Islands, in the Bay of Passamaquoddy, and Grand Manan in the Bay of Fundy. As early as 1785, the British provincial authorities attempted to enforce their jurisdiction over the three first-mentioned islands. The sheriff of Charlotte county summoned from there grand-jurors to attend the county court, but the government of Massachusetts resisted these attempts, and was supported in its resistance by the continental congress; and at one time it seems to have been contemplated to resist the peace officers of the province, and to protect the inhabitants, if it should become necessary, by an armed force. The Nova Scotia authorities never succeeded in enforcing their jurisdiction in these islands. But possession was taken, by the British, of Grand Manan, grants made to private purchasers, and settlements effected, under the authority of the provincial government; so that on the breaking out of the war of 1812, the British had possession of Grand Manan, and the United States of Moose, Dudley, and Frederick Islands, each party claiming title, so far as regards these islands, not only to what was in its possession, but also to what was in possession of the other party. With respect to all the other islands in the Bay of Passamaquoddy, which are very numerous, each party seems tacitly to have dropped its pretensions to those which were in possession of the other. 10 Wait, St. Pap. pp. 10–40; 3 Wait, St. Pap. pp. 117–120. Of these, by far the greatest portion, both in number and value, were in the possession of the British. Those in the possession of the United States were but few in number, all of them small, some uninhabited, and some of too inconsiderable importance to have acquired a name. No one of them is named, so far as I have been able to learn, in any stage of the controversy, and their position is such that the title of the three principal islands, which I have mentioned, being settled to be in the United States, these follow of course. While, on the other hand, of those not named in the commissioners' report, and in the possession of Great Britain, two, which have been formerly claimed by the United States, namely, Campobello and Deer Island, are of considerable magnitude, have extensive settlements, and a number of smaller islands as dependencies, which must follow their fate. The commissioners have named in their report only these islands, the title to which was considered, at that time, as liable to serious doubts, and which may be said, in fact, to have embraced the whole of the disputed ground. Three of these had been in the actual possession of the United States from the peace of 1783, to the war of 1812, and to these the title of the United States was confirmed; one had, in like manner,

been in the possession of Great Britain, and her title was confirmed to that. Why the commissioners did not proceed to name the other islands in the Bay of Passamaquoddy, the title to which was referred to their decision, is not for me to say. But any one who will look into a chart of the bay will easily be satisfied that any attempted enumeration would probably be incomplete. In deciding, also, on the title to Grand Manan, no notice is taken of the large number of small islands which would naturally follow the principal, as dependencies, and which, as well as that, were in the actual or constructive possession of Great Britain. It would, as it appears to me, be an unwarrantable construction of the report, to hold that it leaves the title to these islands undecided; yet if they do not follow as accessories of Grand Manan, they must be considered as still in controversy, for their geographical position leaves the title involved in the same uncertainty as that of the principal island. It seems to me that a fair construction of the report confirms to both parties their title to the islands, as they were held by actual possession and occupation, from 1783 to 1812. This is the principle, or at least the effect of the decision, as to the islands which are specifically named, and which, in point of fact, constituted the whole subject-matter of controversy, at the time when the decision was made.

The difficulty which this construction has to encounter, is in the general words, by which all the other islands in the Bay of Passamaquoddy, except the three named, are decided to belong to Great Britain. If we take the language of the decision literally, it will put Great Britain in possession of six or seven small islands, lying directly between Moose, Frederick, and Dudley Islands, and the main land on the United States side of the bay, and to which she has never preferred a claim; a result which we cannot suppose to have been in the intention of the commissioners. The amount of territory involved is but of trifling value, but it would introduce a confusion and uncertainty in the jurisdictional line, extremely inconvenient to both parties, and multiply the embarrassments already sufficiently perplexing, in the way of enforcing the revenue laws of both governments. A reasonable construction may be given to the decision, which will not involve such a glaring absurdity, and one fraught with so much inconvenience, by supposing the intention to be to confirm the title of Great Britain to Deer Island and Campobello and their dependencies, which had formerly been in controversy, and extinguish any claim which the United States might be supposed to have to them.

Adopting this construction of the commissioners' decision, that it assigns to each party a title according to its possession, as it was held in 1812, it becomes important to inquire which party had the possession of Pope's Folly at that time. This is a small island, situated between Frederick Island and Campobello, and nearer by one half to Campobello than Frederick Island. It does not contain more than half an acre of land, and the title is of importance only as affecting the jurisdictional line. It is uninhabited, and its name, if it can properly be said to have one, does not occur in any part of the controversy respecting these islands, so far as I have been able to learn. The small size and little value of this island may be presumed to be the cause why no direct or conclusive evidence of possession is shown, and the court is left to grope its way by such faint lights as the case affords. It is in evidence that the principal ship channel is between this island and Campobello. Though the passage next to Frederick Island is wider, and as deep, this is the most direct, convenient, and most usually taken. Vessels coming up the bay, proceed through it without changing their course; but to take the western passage they alter their course nearly at right angles, and come down into the harbor of Lubec, and then are obliged to bend round and get back precisely upon the line they had left. It is further proved that the jurisdictional line has always been considered as being between this island and Campobello, leaving it consequently in the waters of the United States. The evidence on both sides is, that this is the line which has been heretofore acknowledged, and that which has been practised upon by the revenue officers of both countries. These circumstances, going to show the common opinion of the inhabitants living on the spot, are entitled to some weight in the absence of all contradictory evidence. It is also to be further remarked that the legislature of Massachusetts has twice legislated upon the idea that this island was comprehended within the territory of that commonwealth. It appears to have been included within the limits of the town of Eastport, by the act incorporating that town, and when the town was divided, and a part erected into a new corporation by the name of Lubec, this island was included within the latter town, by the name of Green Island. From these facts, and in the absence of all contradictory evidence, though the island has never been actually occupied, I feel bound to say that it has been constructively in the possession of the United States, and it results from the construction given to the decision of the commissioners, that the title is in the United States. It follows as a necessary consequence that the unlading was within the territorial jurisdiction of the United States, and the goods are forfeited under the 50th section of the collection act.