**UNITED STATES v. 1,010.8 ACRES, MORE OR LESS, SITUATE IN SUSSEX COUNTY, DEL., et al.**

**No. 2.**

District Court, D. Delaware.

June 24, 1944.

William Marvel, Asst. U. S. Atty., of Wilmington, Del., for the United States.

James R. Morford, Atty. Gen., for the State of Delaware.

Herbert H. Ward, Jr., of Wilmington, Del., trustee ad litem.

Isaac D. Short, 2d, of Georgetown, Del., for Levy Court of Sussex County.

James B. Carey and James M. Tunnell, Jr., both of Georgetown, Del., for Commissioners of Lewes, Martin Black and Harry Draper, Mark T. McKee, Lewes Sand Co., and Sussex Sand Co.

David S. Keil, of Wilmington, Del., for Cape Henlopen Surf Club.

LEAHY, District Judge.

The United States condemned more than 1000 acres of land near Cape Henlopen in Sussex County, Delaware, by the Hon. Henry L. Stimson, Secretary of War, filing a declaration of taking, under the authority of 46 Stat. 1421, 40 U.S.C.A. § 258a and Acts amendatory thereof, 26 Stat. 316, 40 Stat. 241, 40 Stat. 518, 50 U.S.C.A. § 171 and the Act of Congress approved September 9, 1940, Public No. 781—76th Cong. 54 Stat. 872. Parties claimant appeared and filed answers. The government deposited $43,118 in the registry of the court as consideration for the land taken. All respondents insist the final award should be, at least, $100,000. After several pretrial conferences the parties agreed that, first, title to the condemned land should be determined and, second, later ordinary procedures should be followed to ascertain the adequacy of the price proffered by the condemner. C. A. Southerland, Esq., of the Delaware bar, was then appointed Special Master, by agreement of all parties, to ascertain the persons who at the time of the taking owned or had any interest in the condemned lands.[1]

■ Claimants. (a) The first of the parties claimant are the Levy Court of Sussex County[2] on the one hand, and the County Treasurer and Receiver of Taxes of Sussex County on the other. Each assert, "that Sussex County, Delaware, is the owner in fee simple of the lands" condemned. The Special Master confessed he was unable to grasp the legal—or factual —basis upon which this claim was advanced. In Delaware, the three counties (New Castle, Kent and Sussex) as such do not hold legal title to real estate within their boundaries without legislative permission. Various agencies of the State have sometimes been vested with legal title to land situate within a county, e.g., the New Castle County Workhouse (the jail) is situated on land the title to which is vested in a Board of Trustees. Revised Code of 1935, sec. 4142. While there are statutes which define the boundaries of the three counties, there is no intimation that they are to be considered as corporations. Id., c. 2, secs. 7 and 8. The Special Master properly rejected the claim filed by these parties as they had no interest in the lands in suit.

(b) H. H. Ward, Jr., Esq., Trustee ad litem,[3] asserts: " * * * the Inhabitants of the Town of Lewes and County of Sussex in the State of Delaware are entitled to certain Rights of Common in Cape Henlopen under or by virtue of a grant by the Court held at Lewes for the County of Sussex and by the King's Authority and by Commission from William Penn, Proprietary and Governor of Pennsylvania and Territories thereunto belonging on the 9th, 10th and 11th days of the 11th month[4] (January) 1682." Admitting a fee in the state, the trustee asserts that it is subject to a perpetual right of common as fixed in the Warner Grant, for the benefit of inhabitants of the Town of Lewes and the County of Sussex. Both the Attorney General for the State and the trustee ad litem argue that the various acts of the legislature (see footnote 22 infra) which attempt to place control over the lands in suit in trustees or the Commissioners of the Town of Lewes, thereby limiting the exercise of the rights of common of all the inhabitants of Sussex County, are "encroachments and inoperative". This argument was rejected

---

[1] Philadelphia Maritime Exchange and Delaware, Maryland & Virginia Railroad Company, originally joined as defendants by the government, have dropped from the proceedings. PME filed a disclaimer of any interest. DMVR Co. accepted $500 for its alleged interest and settled with the government.

[2] For the early functions of the Levy Courts in Delaware, see State v. Commissioners of the Levy Court, 2 Del. Cases, 85, 86 (1797). Cf. Levy Court v. Coroner, 2 Wall. 501, 17 L.Ed. 851, as to the Levy Courts in Maryland. The present powers of the Levy Courts of Delaware may be found in the Revised Code of Delaware 1935, c. 43. These courts no longer have quasi judicial powers. They are purely administrative bodies. See Mealy v. Buckingham, 6 Del. Ch. 356, 22 A. 357.

[3] Appointed by the court to protect the possible claims of inhabitants of the Town of Lewes and the County of Sussex arising out of the "Warner Grant", specifically described later.

[4] By the Calendar Act of 1750 Great Britain adopted the Gregorian calendar, and the beginning of the year was changed to January 1.

124

by the Special Master, together with the trustee's subsidiary contentions. The treatment of these matters will appear later.

(c) The State of Delaware asserts the lands in condemnation "are the property of the State of Delaware". With the exception of the claim just discussed, all claimants concede the fee to the condemned lands was in the State as sovereign. The State joins, however, with the trustee ad litem that the fee title is in the State, subject to a right of common as defined in the Warner Grant. For present purposes, then, the Special Master is affirmed in finding the fee in the State of Delaware.

(d) The Town of Lewes (actually the Commissioners of Lewes, a municipal corporation) first asserted title in fee but later abandoned this position, admitting fee simple title in the State of Delaware, and contends that, by various acts of the legislature, the Town has exclusive jurisdiction over all the lands in question, including the right to sell sand and gravel, and enter into leases with respect to the condemned lands, and use the revenues therefrom for corporate purposes of the Town. Its contentions are: (1) The Warner Grant for the use of the inhabitants of the Town of Lewes and the County of Sussex is by way of "exception" or "reservation" and, since a person not a party to a deed can not take anything by it (except a remainder) the reservation is void, for it creates no estate known to the law; (2) as the grant is to an indefinite and fluctuating class, it is void, not having been made by the sovereign, because, through William Penn, via his Court, it is not a Crown grant; and, finally, (3) any rights created by the Warner Grant have been lost by adverse possession. Six lessees [5] of the Town of Lewes—Cape Henlopen Surf Club, Sussex Sand Company, Lewes Sand Company, Delaware corporations, Rehoboth Trust Company, executor of the Estate of William T. Tappan, deceased, and Martin Black and Harry R. Draper—in addition to Mark T. McKee, who claims an option granted to him by Lewes Sand Company of one of the leases of that company from the Town of Lewes—allege fee simple title in the State of Delaware, but contend that, on the day of the government taking, their valid leaseholds were and are now compensatory in this action. These leases cover defined portions of the Cape lands, with various tenures, and for the purposes, among others, of removing sand and gravel. The leases stand or fall on the Town's claim.

The trustee ad litem alone has filed exceptions to the Special Master's Report. These exceptions will be treated herein.

The parties rest on title records, factual data and written and map exhibits contained in a MS. treatise entitled "Cape Henlopen", written by Houston Wilson, Esq., of the Delaware bar. The Special

[5] By virtue of certain Acts of the General Assembly of Delaware, the Town of Lewes seeks protection for six certain leases it made on various portions of the lands in question. Paragraph 5 of the Town's answer states:

"Acting under the authority of the aforesaid Acts of the General Assembly of the State of Delaware, Commissioners of Lewes, in due course, leased a part of the aforesaid lands to divers persons, firms, and corporations; and at the time this condemnation proceeding was instituted leases in respect to portions of the said lands were in force between Commissioners of Lewes, as lessor, and the following persons, firms and corporations, as lessees:

"Lease to Lewes Sand Company, dated July 1, 1929, for a period of twenty-five (25) years, with privilege of renewal for an additional term of twenty-five (25) years, the said lease being recorded in the Office of the Recorder of Deeds, in and for Sussex County, Delaware, in Deed Book EIG, Vol. 315, Page 495.

"Lease to Lewes Sand Company, dated February 15, 1937, for a period of twenty (20) years, beginning March 1, 1937, and ending March 1, 1957, now of record in the office aforesaid, in Deed Book DIY, Vol. 307, Page 233.

"Lease to William T. Tappan, dated April 2, 1938, for a period of fifteen (15) years, not yet of record but intended so to be.

"Lease to Sussex Sand Company, dated December 5, 1938, for a period of fifteen (15) years, renewable for a further period of fifteen (15) years, now of record in the Office aforesaid, in Deed Book EIH, Vol. 316, Page 253.

"Lease to Cape Henlopen Surf Club, dated June 20, 1939, in force until June 17, 1949, renewable for a further period of ten (10) years, now of record in the Office aforesaid, in Deed Book EIS, Vol. 327, Page 366.

"Lease to Martin L. Black and Harry Draper, dated May 29, 1940, for a period of fifteen (15) years, with the right to renew for a further period of fifteen (15) years, now of record in the Office aforesaid, in Deed Book EIS, Vol. 327, Page 349."

Master has denominated this writing as "Exhibit 2" or, sometimes, as "Wilson's Report". It consists of ten parts embodied in eleven typescript pamphlets.[6]

The contending parties filed cross-claims to dismiss their adversaries' answers for failure to state a claim. The Town of Lewes moved to strike various portions of the Wilson Report, challenging certain expressions of opinion, interpretations and inferences drawn from the ancient records relied on by the author. The Special Master refused to consider such expressions as evidence of probative value. But, the existence or nonexistence of title records and other documents referred to by Mr. Wilson (as well as the textual accuracy of written and map exhibits) were unchallenged by the parties and accordingly accepted by the Special Master.[7]

1. Cape Henlopen. The public use for which the lands were taken was the establishment of harbor defenses of Delaware Bay, near Cape Henlopen, and to provide sites for seacoast batteries and related military purposes. For obvious reasons, it is highly inappropriate to describe further, in detail, the land taken or the use to which it is to be put by the armed forces of the United States of America.[8]

[6] By the Act of May 4, 1939 (42 Laws of Delaware, c. 2, 5) the Delaware Society for the Preservation of Antiquities was made a State agency. It requested an opinion of the Attorney General of Delaware as to the authority of the Commissioners of Lewes to lease a portion of the Cape lands. The State Highway Department, also, wanted to know if it could remove sand from the Cape lands without a lease from the Town of Lewes. Mr. Wilson was retained by the Attorney General to assist in the preparation of the requested opinions. The "Wilson Report" represents his research and views respecting the Cape lands.

Counsel stipulated that Mr. Wilson's work be received in evidence under the following agreements:

"The written report of Houston Wilson, Esquire, to the Attorney General of the State of Delaware, together with all exhibits and copies of plats, maps and other documents submitted with said report (said report consisting of Parts I to X inclusive with exhibits and copies of supporting documents), shall be received as competent evidence in this cause in lieu of the oral testimony of the said Houston Wilson, Esquire, as a witness on behalf of the State of Delaware, and on behalf of Herbert H. Ward, Jr., Trustee ad litem for the inhabitants of the Town of Lewes and County of Sussex in the State of Delaware, subject, however, to the right of objection and/or motion to strike as to any part of said report or exhibits on the part of any other party hereto, subject to the right of cross-examination on behalf of any other party hereto, subject to the right of re-examination by any party hereto and subject further to the right of any party to offer further evidence with respect to title, leasehold or other interest or right of participation in the fund, either in support of or in contradiction of the said report of Houston Wilson, Esquire, or any part thereof."

[7] The Special Master concluded: "Perusal of the report goes far to convince the reader that the task of unearthing and marshalling the facts pertinent to questions of title to the lands of 'Cape Henlopen' has been thoroughly—indeed exhaustively—performed, and that all pertinent records are set forth as written exhibits thereto. The immediate issue is thus to be regarded as one which presents only questions of title, and which comes before the Court upon an agreed statement of facts, requiring conclusions of fact and law to be drawn therefrom."

[8] Wilson's Report, Part V, shows that the United States has already occupied various portions of the Cape Lands. As early as September 30, 1763, James Hamilton, Lieutenant Governor under Thomas and Richard Penn, Proprietaries of the three lower counties, with the consent of the General Assembly, provided for the erection of a lighthouse at the mouth of the Delaware Bay, near Cape Henlopen. Following similar amendatory legislation, on January 29, 1791 the General Assembly of Delaware authorized the Senators of the State of Delaware in the Congress of the United States to execute a deed conveying to the United States of America the Cape Henlopen lighthouse, together with all lands appurtenant thereto. See, Wilson's Report, id. pp. 110–113. On March 20, 1863, the General Assembly of Delaware passed an Act whereby a parcel of land not exceeding 40 acres was ceded to the United States of America, in perpetuity, provided the land was to be used for the erection of certain fortifications. On February 4, 1864, the Act was amended so as to include an area not exceeding 200 acres. This area became known as the United States Iron Pier Reservation. Wilson reports that the United States has sold this reservation to private individuals. Wilson's Report, id., pp. 116-118. For the transfer of other portions of the land for fort, quarantine

2. The basic title to the land and waters of the State of Delaware rests on two deeds of feoffment from James, Duke of York, to William Penn, each dated August 24, 1682. One deed conveys a tract of land lying within a circle of twelve miles from the Town of New Castle; the other includes a tract of land extending south from New Castle.[9] These deeds contained covenants for further assurance. On March 22, 1682/3 letters patent of Charles II under the Great Seal of England were issued to the Duke of York for the same lands and waters described in the former deeds of feoffment from York to William Penn.[10] "There is no doubt that these letters were delivered to the Duke";[11] later delivered to Penn; and were never thereafter surrendered or abandoned. The letters gave "powers of government and other proprietary and seignorial rights" to York "along with ownership in fee."[12] Whether Penn enjoyed governmental powers under the deeds of feoffment or they passed to him by estoppel from York is immaterial since later letters patent of August 20, 1694, from the Crown to Penn confirmed his title to such powers. In reviewing Penn's struggles to maintain his government, Mr. Justice Cardozo once wrote:

"There were, it is true, intermittent challenges both of the proprietary interest of Penn and his successors and of their governmental powers. As to these last, the most serious challenge was one that followed the accession of William and Mary in February, 1689, after the deposition of James II as the result of the 'Glorious Revolution.' Penn, who had been a favorite of royalty during the reign of James, was for a time under a cloud. In 1692, he was removed from the Government of Pennsylvania, including the New Castle county, and his place given to a successor. But he was soon restored to power, and, it

seems, to the royal confidence. In August, 1694, there was an Order in Council by which he was reestablished in his former office. In the same month letters patent issued under the Great Seal of State restoring him in the most formal way to the administration of the government of the 'said province and territories', and revoking any other appointment inconsistent therewith.

"This patent, it would seem, had settled for all time the validity of his exercise of governmental powers, however much it may have left in doubt his title to the land. Mutterings of uncertainty, however, continued to be heard as to his rights and powers in both aspects. In 1701, he had correspondence with the Board of Trade which showed itself restless on the subject of his ownership. At intervals during the reign of Anne and afterwards he was required to sign a declaration that the approval by the Crown of his governmental acts, such as the appointment of a deputy, was not to be construed in any manner to diminish 'her Majesty's claim of right to the said three lower counties.' But the claims of right thus reserved were never admitted by Penn to be valid, nor were they ever pressed by the Crown. Not even the petitions of jealous rivals, egging the Crown on, were of avail to wake it into action. Thus, in 1717, the Earl of Sutherland applied for a grant of the three Lower Counties, asserting that he was ready to prove that the title was in the Crown. The Attorney General issued a summons to Penn to be present at a hearing, but Penn, who had suffered a stroke of apoplexy, was unable to appear, and the proceeding was allowed to lapse. A like fate awaited similar petitions submitted in later years. Reservations of the royal claims might continue to be made by cautious scriveners. By the time of the Revolution they were

---

and coast reservations, as well as for other defense functions, by the State to the United States, see Wilson's Report, id., pp. 118–128.

[9] See 1 Laws of Delaware, Appendix pp. 1–7.

[10] The description reads: "All that the Towne of Newcastle otherwise called Delaware and the fort therein or thereunto belonging scituate lying and being between Maryland and New Jersey in America And all that Tract of land lying within the Compasse or Circle of twelve miles about the said Towne Scituate lying and being upon the River Delaware and all

islands in the said River of Delaware and the said River and Soyle thereof lying North of the Southermost part of the said Circle of twelve miles about the said Towne And all that Tract of Land upon Delaware River and Bay beginning twelve miles South from the said Towne of Newcastle otherwise called Delaware and extending South to Cape Lopen [Henlopen]."

[11] State of New Jersey v. Delaware, 291 U.S. 361, at page 366, 54 S.Ct. 407, at page 409, 78 L.Ed. 847.

[12] Id.; 291 U.S. at page 366, 54 S.Ct. at page 409, 78 L.Ed. 847, footnote 1.

little more than pious formulas. A title, good of record when reinforced by the patent of 1683, had been confirmed by a century of undisturbed possession. When the Treaty of Paris was signed in 1783, the land within the circle was part of the territory of Delaware, and the title was in the Penns or in persons claiming under them."[13]

Returning to Penn's early efforts to organize a government for Delaware, we find he reorganized or recommissioned the Court [13a] "for the County of Whorekill alias Deale" (now Sussex County) by a commission issued November 25, 1682.[14] Penn issued a directive which stated: "First, That you, in open Court, shall receive all peticons from the time that may be made by such persons as designe to take up Land among you and that you grant them a Warrant to the Surveyor to admeasure the same, provided always that you exceed not three hundred acres of land to a master of a family, nor a one hundred acres to a single person, at one single penny per acre or value thereof in the produce of the country, which done, that the Surveyor make his returne into Court and that the Court make thereon returne unto my secretary's office."[15]

3. The Warner Grant is the base of this litigation. The Sussex County Court, sitting in Lewes, on January 9, 10 and 11, 1682/3, issued the grant, viz., "Upon the petition of Edmond Warner the Court grant unto him the land of the Cap Commonly Called Cape Inlopen lying on the North East side of the Creek formerly called the Whorekill to make a Coney Warrin on and Liberty to Build a House and seat a Warriner upon the said land upon condition that the Timber and feed of the said land, and marshes thereunto Belonging be and forever hereafter Lye in Common for the use of the Inhabitants of the Town of Lewes and County of Sussex, as also free liberty for any and all of the Inhabitants of the said County to fish get and take of there oyster & cockel shells and gather plums crambereys and Hucklebureys on the said land as they shall think fitt always provided that no person whatsoever shall not hunt or kill any Rabbits or hares on the said land without the Leave and consent of him the said Edmond Warner his Executors Administrators or Assigns * * *"[16] There is no map exhibit of the location of the land with respect to the "land of the Cape". Comparison of a government map exhibit[17] with those contained in the Wilson Report[18] shows the lands to be northeast of Lewes Creek (formerly the Whorekill) and are, upon the stipulation of the parties, a part of the lands contained in the Warner Grant.

The question for decision calls for a construction of the Warner Grant with respect to the rights in common created therein, and the effect of certain acts of the General Assembly of the State of Delaware relating to the grant.

4. As the court adopts the findings of the Special Master and as it is impossible to improve on his expert analysis of the questions contained in the reference, liberal quotations will be utilized in adopting his views. in construing the Warner Grant.[19]

"Southerland, Special Master.

"I. *The Construction and Validity of the Warner Grant.* The wording of the grant is unusual, but it seems reasonably clear that it was intended to create two rights or privileges, viz., a right in Edmond Warner to establish a coney or rabbit warren and a right of common in the inhabitants of the Town of Lewes and County of Sussex. The words 'upon condition that' which join the two parts of the grant would ordinarily indicate an intention to create an estate upon condition. Such an estate is

---

[13] Id.; 291 U.S. at pages 369, 370, 54 S.Ct. at page 410, 78 L.Ed. 847.

[13a] Such a Court had been established there under the Duke of York and when the territory was transferred to Penn the system of government was transferred with it.

[14] Scharf, History of Delaware, Vol. 1, pp. 516-7.

[15] Scharf, op. cit.. Vol. II, p. 1203; Wilson's Report, Part I, pp. 22-23, 25-26. Both the Provincial Assembly and the General Assembly of the State of Delaware recognized the validity of grants which trace back to the propri-

etaries. 2 Laws of Delaware, p. 1174; Act of 12 Wm. III (1700).

[16] The grant is recorded in the Recorder of Deeds Office for Sussex County in Deed Record A, No. 1, p. 14, 109. It is also found in Wilson's Report, Part III, Ex. V.

[17] Gov. Exhibit No. 1.

[18] Wilson's Exhibits J and K.

[19] Minor stylistic but no legal alterations have been made in quoting from the report of the Special Master. Several footnotes, by way of aside, have been added.

defined by Blackstone as one 'whose existence depends upon the happening or nonhappening of some uncertain event, whereby the estate may be either originally created, or enlarged, or finally defeated.' II Blackstone's Commentaries 152. The function of the condition is to define the event which affects the granted estate. In the instant case, however, it seems clear that the purpose of the clause following the phrase 'upon condition that' was to create concurrently another and different estate. Because of the language employed, this second grant might be considered as also embodying a condition precedent to the vesting of the first estate. But this is of no moment; the important consideration is the clear intention of the grant to create a right of common in the Cape lands for the benefit of the classes of persons defined in the grant. Any other construction renders the language meaningless.

[redacted] "The invalidity of the grant is, however, asserted by the Town of Lewes on two grounds, as above stated.

"(a) Realizing the difficulty of construing the latter part of the grant as nothing more than a technical condition in law, the attorneys for the Town of Lewes nevertheless argue that the clauses of the grant referring to the right of common constitute either a 'reservation' or 'exception' in the grant; that a reservation or exception in a deed must be to the grantor; and that a reservation or exception in favor of a person not a party to the instrument is invalid; citing II Blackstone's Commentaries, p. 299; 26 C.J.S., Deeds, § 137.

"I am unable to agree with this contention. The latter authority (18 C.J. 340) defines a reservation as follows: 'A reservation is a clause in a deed whereby the grantor reserves some new thing to himself out of that which he granted before. It differs from an exception which is ever part of the thing granted and of a thing in esse at the time.'

[redacted] "It is apparent that the right of common contained in the Warner grant is not a right reserved out of the estate granted to Warner, because the Warner estate is not a fee simple or even a freehold estate in the land out of which the right of common could be carved; it is merely a right to take and kill game. That the grant is so limited is clear from the grant of 'Liberty to Build a House and seat a Warriner upon the said land'—language wholly superfluous if a grant of a freehold estate had been intended. The right to take and kill game, even if granted by the Crown, is, at the most, a franchise, and, as such, an incorporeal hereditament. Halsbury's Laws of England, Vol. 15, p. 415; Vol. 6, p. 582, note (n). In the instant example, the absence of words of inheritance might reduce the grant to a mere personal license; cf. Thompson on Real Property, Vol. I, Sec. 227; but it is unnecessary to determine the point.

"It seems clear that the Warner grant contains two grants, concurrent even if they be not wholly independent, one a franchise or license to take and kill game, and the other a right of common—both (at the most) incorporeal rights.

[redacted] "(b) The second objection urged by the Town is, as above stated, that the grant is to an indefinite and fluctuating class of persons, and that such a grant is void, at least unless made by the sovereign. The cases relied on in support of this contention are those dealing with grants made by private persons or municipalities, and not by the sovereign. Counsel for the Town concede, as I read their brief, that such a grant, if made by the sovereign, is valid, since the sovereign has the power to create corporations, and the grantees will be treated as a corporation quoad the grant. Willingdale v. Maitland, L.R. 3 Eq. 103.

[redacted] "Since a grant to a fluctuating class is conceded to be valid if made by the sovereign, we may inquire whether the Warner grant was so made. It seems clear that it was. Counsel for the Town assert that it is 'not a grant from the Crown, but is alleged to be a grant from William Penn, through his duly constituted Court.' But in constituting a Court, and in conferring upon it power to receive petitions and grant lands, it can hardly be doubted that Penn was not merely granting lands which he owned in fee, but was also exercising the powers of government which had been granted to him by or through the Duke of York, and which he and his successors, as proprietaries, continued to exercise until the Revolution. [State of] New Jersey v. Delaware, supra, [291 U.S. at page] 370 [54 S.Ct. 407, 78 L.Ed. 847]. If it be objected that he did not expressly confer upon the Court the authority to create corporations, the answer would seem to be that the commission to his Court necessarily carried with it all powers necessary to implement and make fully effective the powers expressly granted.

"And it is to be noted that at least two other similar grants were made by the Proprietaries, that of the 'Great and Beach Marshes',[20] and that of the New Castle Commons (see the case of New Castle Commons v. Megginson, 1 Boyce, 361, 24 Del. 361, 362, 77 A. 565, Ann.Cas.1914A, 1207, hereinafter discussed), the validity of which appears never to have been questioned.[21]

◼ "One other point is urged by counsel for the Town, viz., that the absence of words of inheritance in the Warner grant prevents an inheritable estate from passing. If it be assumed that the use of the phrase 'heirs and assigns' is indispensable to create an incorporeal hereditament passing on death of an individual to his heirs at law, yet the rule clearly has no application to the Warner grant, which, as hereinafter shown, creates a species of trust or equitable use. The word "heirs" is not, it seems, necessary for the creation of an equitable fee simple * * *.' 1 Tiffany Real Property, Sec. 29.

◼ "In conclusion, it is to be observed that, all other considerations apart, the legislative recognition of the grant, now to be considered, renders invalid all of the foregoing objections, as well as all other technical objection thereto."

5. The Special Master then proceeded to treat the various legislative acts dealing with the Cape lands by discussing three questions: (a) the charge of "encroachment"; (b) the limitation of the beneficiaries to the inhabitants of Lewes; and (c) the enforceability and constitutionality (Delaware State Constitution) of the Act of May 21, 1941, re-incorporating the Town of Lewes. To continue with the Special Master's Report:

◼ "II. Legislation[22] Affecting the Grant. (a) The charge of 'encroachment'. The series of legislative acts dealing with

---

[20] Described, infra, in footnote 22h.

[21] If the validity of the Warner grant rested solely upon the doctrine of the implied creation of a corporation, the question might be tinged with doubt, since there is no evidence that the inhabitants of Lewes and Sussex County ever sought to act collectively as a corporation; cf. Harris v. Chesterfield [1911] 2 A.C. 623; but this is of no consequence. As hereinafter shown, the grant created a species of charitable use or trust.

[22] Starting from 1799, the General Assembly of Delaware enacted a series of statutes—the latest in 1941—dealing with the Cape lands, the rights of common attaching thereto, and the management of those lands.

a. Act of January 24, 1799 (3 Laws of Delaware 67). This statute was intended to prevent trespass. In substance, it prohibits any person from cutting or bringing any green timber or wood on or from the Cape for private use under penalty of a misdemeanor. A supplemental act of January 30, 1813 (4 Laws of Delaware 607) increased the penalty. The preamble of the original act states: "Whereas a grant was formerly made by the proprietaries of Pennsylvania to the inhabitants of the Town of Lewes and county of Sussex, of the lands and marsh called the Cape, which are liable to be pillaged and much injured, the timber of which is a defence against the sea, and if once destroyed, the navigation of said creek may cease; for remedy thereof * * *" (enacting clause follows).

b. Act of February 15, 1814 (5 Laws of Delaware 40). The Title reads: "An Act authorizing the Court of General Quarter Sessions* of the Peace and Gaol Delivery, of the State of Delaware to appoint trustees to take charge of, and secure, the rents of the lands and marsh commonly called Cape Henlopen, for the use of the county of Sussex." The Court is authorized to appoint trustees "to take possession of, and rent to the highest and best bidder, in lots, the aforesaid lands and marsh for any time not exceeding three years; and the money arising therefrom to be paid over to the county treasurer for the use of the county of Sussex only." Moreover, any person who shall cut any timber, or turn on any cattle, horses or hogs on the lands or marsh of the Cape, without first entering into an appropriate agreement with the trustees shall be liable to suit by them in a sum not exceeding $32.

c. Act of February 20, 1837 (9 Laws of Delaware 167). This statute simply supplements the foregoing acts. A new court—The Superior Court—is called into operation with authority to appoint trustees who will "have power and authority to sell or rent, to the highest and best bidder, in lots, the lands and marsh upon the north east side of Lewes [Whorekill] creek, called Cape Henlopen, for any time not exceeding three years

---

* See Delaware Cases, 1792–1830, edited by D. J. Boorstin (West Pub. Co. 1943) for references to the Delaware Court of General Quarter Sessions p. xxiii et seq.

the lands of the Cape and the right of common therein has been set forth in footnote 22. Beginning with the Act of January 24, 1799, which embodies an express recognition of the validity of the Warner grant, the General Assembly from time to time passed ·measures designed, as I read them, to protect and make effective the rights of common embodied in the grant. Thus the Act of February 15, 1814, authorizes the appointment of trustees 'to take charge of, and secure the rents' of the Cape lands, which were to be paid to the County Treasurer 'for the use of Sussex County only'. The Act of February 20, 1837, is similar in intent and scope. It is true that the Act of February 19, 1841, which transfers supervisory powers to the Commissioners therein named, appears to ignore the rights of the beneficiaries of the grant,

* * *". A rearrangement of increment provides that one-half the proceeds arising from sale of lots and sale of dead wood, or other timber, is to be applied "to ditching and draining said marsh and lands" and the other half to be applied, as previously directed, "for use of the county of Sussex." The legislature gave this particular act a life of ten years.

d. Act of February 19, 1841 (9 Laws of Delaware 411). The title reads: "An Act to improve the navigation of Lewes Creek, by cutting and making a canal near Green Bank." Then, the statute provides that "George Hickman, Lewis West, John Rodney, Robert Russel and John Arnel, the commissioners aforesaid, are herein and hereby appointed trustees in *behalf of the State*, of all the lands and marshes in Lewes and Rehoboth hundred, on the northeast side of Lewes Creek, *belonging to this State*, called Cape Henlopen, for the term of four years from the passing of this act, with full power and authority to sell or rent to the highest and best bidder, in lots, the lands and marsh aforesaid, for any time not exceeding four years from the passing of this act as aforesaid, and also to dispose of all the dead wood (or other timber for the use of stranded vessels), for the best price that can be obtained for the same, or a majority of them, paid over to the managers appointed under this act, and by them applied to cutting or making the canal aforesaid, unless the aforesaid trustees or a majority of them, believe that one-third of the nett proceeds arising from the sale or rent of said marsh and timber, can be more profitably applied to draining said marsh; then, and in that case, they or a majority of them, are hereby authorized to apply one-third of the nett proceeds of said lands and timber to draining said marsh, and the remaining two-thirds to pay over to the managers under this act, to be by them applied to cutting or making the canal aforesaid." (Italics supplied.)

e. Act of February 3, 1847 (10 Laws of Delaware 134). This act is similar to the Act of February 19, 1841, but appoints the named trustees "in behalf of this State" of the lands "belonging to said State" for the term of eight years with authority to sell or rent the lands and marsh for a period not exceeding eight years. Disposition of the proceeds is in substance similar to that provided in the previous acts.

f. Act of February 15, 1849 (10 Laws of Delaware 309). This statute strikes out the words, appearing in the former act, "*said State*" and substitutes the words "the inhabitants of the Town of Lewes, in the county of Sussex." (Italics supplied.)

g. Act of March 2, 1857 (11 Laws of Delaware 486). This statute attempts to regulate the Town of Lewes, which was originally incorporated on February 2, 1818. 5 Laws of Delaware 309. The 1857 statute—just after the expiration of the eight-year period fixed by 10 Laws of Delaware 134 (e. supra)—supplements the charter of the Town of Lewes. E.g., "That the said Commissioners shall also have the general supervision and trustship of the public land on the north-east side of Lewes Creek, called 'The Cape', with power to lease the same or any part thereof, for terms not exceeding three years and to sell the timber and wood thereon, and to sue for and recover damages for any trespass that may be committed by any person on said cape lands, timber or wood." Here, the proceeds are to be expended for improving and repairing the streets of the Town of Lewes, the banks along the Creek, and the bridges and footwalks.

h. Act of August 10, 1864 (12 Laws of Delaware 473). This statute amends another entitled "An Act appointing Commissioners of the Great and Beach Marshes" passed earlier the same year, i.e., February 11, 1864. Wilson's Report, Part III, Exhibit AQ, shows that a proprietary grant of June 23, 1739, dedicated a tract of marsh on Delaware Bay near the Town of Lewes "in trust and for the use and behoof of the inhabitants of the Town of Lewes * * * and their successors." The grantee-trustees are named. Under the Acts of March 24, 1863, and February 11, 1864 (12 Laws of Delaware 358, 447), certain persons were appointed "Commissioners of the Great and Beach Marshes near Lewis-

since it refers to the Cape lands as 'belonging to this State'; but this 'encroachment' (if it be one) was withdrawn by the Act of February 15, 1849, which substituted the words 'inhabitants of the town of Lewes, in the County of Sussex' for the words referring to the State of Delaware. The effect of the language appearing to limit the beneficiaries to the inhabitants of Lewes alone is hereinafter considered; at this point I merely indicate the legislative recognition of the Warner grant and the adoption of measures designed to make it effective.

"By the Act of March 2, 1857, jurisdiction over the lands of the Cape was transferred to the Town of Lewes. The language employed for the purpose, viz., 'That the Commissioners shall also have the general supervision and trustship of the public land * * * called "the Cape",' is of significance, emphasizing, as it does, the trust or equitable use attaching to the land. The proceeds of leases and sales are directed to be expended for municipal improvements.

"From 1864 to 1871 jurisdiction over the Cape lands was vested in the 'Commissioners of the Great and Beach Marshes', and receipts from sales to 'public improve-

town in Sussex County," with exclusive power to sell and dispose of the grass and hay thereof. From the internal evidence the Special Master suggests that the "Great and Beach Marshes" was the name given to the *marsh* referred to in the proprietary warrant. Cf. The Warner Grant, supra. The amendatory Act of August 10. 1864, after referring to the word "Marshes" adds "and Cape Marshes". From this, the Special Master concluded that the effect of this particular statute was to transfer to the Commissioners of the Great and Beach Marshes jurisdiction over a portion of the lands of the cape. These particular Commissioners were to devote revenue, according to the February 11, 1864 Act, to "public improvements about Lewistown".

i. Act of March 2, 1871 (14 Laws of Delaware 126). This is an act which incorporates the Town of Lewes. Its government lies in five commissioners elected by the inhabitants of the town. All public and vacant lands within the corporate limits of the town are "vested in the Town of Lewes, and the Commissioners of said town shall have jurisdiction over the same * * *". The Commissioners shall have "full and exclusive authority and control over the Great and Beach Marshes, Cape and Cape Marshes, near Lewes." Authority extends to sell, from the lands, grass, hay and wood, the proceeds of which are to be applied "to such improvements of the Town of Lewes as they may deem proper." But, it was specifically provided "that nothing in this section or act shall authorize the said commissioners to pass any ordinance to prevent any citizen of said Town of Lewes from fishing along said Delaware Bay shore, or from grazing cattle on said Cape or Beach or Cape Marshes."

j. Act of March 7, 1901 (22 Laws of Delaware, c. 199, p. 448). This is the statute which re-incorporates the Town of Lewes. It contains, substantially, the same provisions with respect to the Cape lands as are contained in the Act of March 2, 1871, i. supra.

k. Act of April 11, 1907 (24 Laws of Delaware, c. 220, p. 594). This is another act to re-incorporate the Town of Lewes. It deals with the "vested lands" of the town. It provides, inter alia, that "All of the public and vacant lands lying within the corporate limits of said town of Lewes, and all the public or vacant lands contiguous to but outside the corporate limits of said town and fronting on the Bay between the point of Cape Henlopen on the south and Veasey's Inlet on the north, shall be vested in the Commissioners of Lewes and the said Commissioners shall have jurisdiction over the same; * * *." § 7. This act contains, in addition, substantially the same provisions as were noted in the acts noted in i and j supra.

l. Act of April 2, 1925 (34 Laws of Delaware, c. 144, p. 362). By this statute the Town Commissioners were authorized "to sell sand and gravel by measure or otherwise" from the lands.

m. Act of May 21, 1941 (43 Laws of Delaware, c. 170, p. 723). This is, at the time of filing this opinion, the last act to reincorporate the Town of Lewes. With respect to the Cape lands it contains the same provisions as are found in the acts discussed in k and l supra.

The Special Master concluded that these footnoted abstracts of legislation include all statutes passed by the General Assembly of Delaware bearing on the questions sub judice. The Trustee ad litem calls into consideration the Acts of March 29, 1907, April 2, 1913, and April 18, 1929 (24 Laws of Delaware, c. 12, p. 22, 27 Laws of Delaware, c. 5, p. 9, and 36 Laws of Delaware, c. 2, p. 4). The trustee claims that these statutes have effected a transfer of jurisdiction over the Cape lands to the State Highway Department of Delaware. The validity of his argument will be treated in the text of this opinion, infra.

ments about Lewistown'; but by the Act of March 2, 1871, such jurisdiction (as well as jurisdiction over the Great and Beach Marshes) was conferred upon the Town of Lewes, with which it has at all times since resided.[23] At all times from the passage of the Act of March 2, 1871, to date, the revenue from the lands is required by applicable statutory provision to be applied ·to 'improvements' of the Town of Lewes.

"Now, these Acts, which on their face have from the first evidenced a recognition of a use or trust attaching to the Cape lands, are claimed by the trustee ad litem to constitute 'encroachments' on the supposed unrestricted privileges of inhabitants of Sussex County to avail themselves of the several rights of common conferred by the Warner grant. This view appears to be acquiesced in by attorneys for the Town of Lewes, who, in referring to the legislative acts, assert that—'Adverse possession over the lands in question has been consistently maintained by the State and its various agencies continuously for a period of at least 150 years.'

"I naturally hesitate to dissent from a view apparently acceptd by counsel for both parties; yet it seems to me clear that it is unsound. The legislative acts assailed as encroachments upon or as adverse to the rights of the beneficiaries of the grant are, I repeat, acknowledgments of the existence of such rights and attempts to regulate them, realize upon them and make them effective. This is so because the scope of the rights granted is, on the face of the grant, unlimited in respect of time, number or quantity, and it is difficult to see how, except through legislative measures such as appear in the instant case, the rights of the beneficiaries of such a grant could be enforced or protected, or how otherwise the grant could be made productive with any semblance of equality or equity among the beneficiaries.

"Before developing further this aspect of the matter, viz., the propriety of legislation to insure an equitable distribution of benefits conferred by the Warner grant, it is in order to examine more closely the nature of the estate created by the grant and the principles of law applicable thereto.

■ "The estate created by the grant purports to be that of a right of common in gross.[24]

"With respect to the scope or extent of the right, the Warner grant includes 'the timber and feed' of the land and marshes, and 'also free liberty * * * to fish get and take of there oysters & cockel shells and gather plums crambereys and Huckelbureys * * *.'

"The trustee ad litem treats the grant of a right to take 'timber' as a common of estovers, or wood to be used to heat or repair the commoner's house (Halsbury's Laws of England, Vol. 4, p. 551); the right to take feed as a common of pasture for cattle (Halsbury's Laws of England, Vol. 4, p. 532 et seq.), as well as the right to cut grass and hay, and the right to use the marshes as probably a common of digging in the soil for minerals. As to the timber and feed at least, this would appear to be correct. But it is to be noted that the grant contains no language prescribing the time or times during which the rights may be exercised or fixing the amounts or quantities of timber, feed, game, etc., which may be taken. The grant is, on its face, of rights of common unlimited in any respect.

■ "It appears that such a right of common does not exist at common law. The trustee ad litem cites Blackstone's Commentaries, Vol. 2, p. 34, as authority for a common of pasturage 'without stint'. The cited passage reads: 'All these species, of pasturable common, may be and usually are limited as to number and time; but

---

[23] Unless transferred to the State Highway Department—a question considered infra.

[24] " 'Common, or right of common, appears from its very definition to be an incorporeal hereditament: being a profit which a man hath in the land of another; as to feed his beasts, to catch fish, to cut wood, or the like'. 2 Blackstone's Com. p. 32.

" 'A right of common has been defined to be ."a right which one or more persons may have to take or use some portion of that which another man's soil

naturally produces" '. Halsbury's Laws of England, Vol. 4, p. 529.

" 'Common in gross, or at large, is such as is neither appendant nor appurtenant to land, but is annexed to a man's person; * * *' 2 Blackstone's Com., p. 34.

" 'Right of common in gross is a right depending upon a grant or prescription entitling the possessor to some user of a particular waste without reference to any particular land.' Halsbury's Laws of England, Vol. 4, p. 531."

there are also commons without stint, and which last all the year.'

"It would appear, however, that even this eminent authority has stated the rule too broadly. Appended to the quoted sentence is the following note by Chitty: 'The notion of this species of common is exploded. A right of common without stint cannot exist in law. Bennett v. Reeve, Willes, 232. 8 T.R. 396--Chitty.' [25]

"Another eminent authority says: 'Common of pasture appurtenant may either be for a number certain, or the measure may be referred to levancy and couchancy; but it is now clearly settled that there must be some limit to the right. * * * The expression "common sans nombre", which is frequently met with in the early cases, or "common without stint", means common for beasts levant and couchant, it being uncertain how many there are in any particular year, and does not mean common for any number of beasts. It is used in distinction to "common for a number certain", and is a common certain in its nature, because id certum est quod certum reddi potest.' Halsbury's Laws of England, Vol. 4, p. 539. 'Common of pasture in gross may be either for a certain or sans nombre, which, as has already been explained, does not mean without limit.' Id. p. 543.

"The foregoing authority cites, inter alia, the case of Benson v. Chester, 8 T.R. 396, 101 Eng.Rep. 1453, decided by the Court of King's Bench in 1799, from which I quote the syllabus: 'A claim of a right of common without stint as annexed to an ancient messuage, without law, cannot, as such exist by law. An ancient deed of feoffment granting the wastes of a manor to feoffees, in trust to permit the tenants and inhabitants, &c, to use and enjoy the same as they had formerly done or been accustomed, to do must be taken to mean such a right of common as may by law exist, namely, a right of common restricted by levancy and couchancy.'

"The same rule is stated in respect of common of estovers. 'A claim to estovers, in order to be valid, must be made with some limitation or restriction, either by reference to the necessities of the tenement in respect of which it is claimed, or by defining the quantity of the profit to be taken, as, for instance, a right to take so many cartloads of fuel.' Halsbury's Laws of England, Vol. 4, p. 554.

"Again with respect to the right of digging for sand (if the grant may be construed to include such a right, as contended), it is said: 'The right of digging for sand, stone, coals, minerals, etc., has also been recognized as a right of common from early times. It is similar in nature to the commons of estovers and turbary, and may be appurtenant or held in gross, * * * Prescriptions for these rights must fall within the usual rules. The right must be claimed by persons capable of taking by grant, must be reasonable and certain in its nature, * * *.' Halsbury's Laws of England, Vol. 4, pp. 557, 559.

"Thus in Clayton v. Corby, 5 Q.B. 415, 114 Eng.Rep. 1306, a plea in an action of trespass of a right of common to dig and carry away so much of the clay of plaintiff's close as should be required by defendant for making bricks at his brick kiln was held unreasonable and bad. The Court said: 'The nature of the tenement (so called), a brick kiln, leads to no conclusion, one way or the other, as to the extent of the claim and demand upon the soil of the plaintiff. It may have been, at the time of the trespass, of any dimensions and capacity. It may have been, during the thirty years of alleged enjoyment, continually varying; and consequently the quantity of clay required for the purpose of making bricks thereat may have varied also. There is no limit. No amount of clay (measured by cartloads or otherwise) "required", no number of bricks (estimated by hundreds or thousands) claimed to be made, is given or attempted. What is it, therefore, but an indefinite claim to take all the clay "out of and from the said close in which, &c", or, in other words, to take from the plaintiff, the owner, the whole close?'

"I am far from suggesting that the grant here under examination was beyond the power of the Proprietary to make. But I do say that the foregoing authorities establish that the rights created by the Warner grant, though no doubt, broadly speaking, rights of common, are different in important respects from the ordinary examples of such rights which were recognized by the common law and protected by the courts at the suit of the commoner. The Warner grant appears to create rights which, by their very nature, call for supervision and control by the public authorities, in order that the benefits which the grant seeks to

---

25 Lewis Edition, Phila.1898, p. 501.

confer may be equitably enjoyed. If such control be lacking, the benefits will be lost, since unrestricted use will defeat the very purpose of the grant. Can it be supposed, for instance, that the first man to go upon the common lands may take all the timber and feed for himself? And if not, how much? And if it be answered—'a reasonable quantity', then how is such a quantity to be ascertained, and how is the limitation to be enforced?

"The trustee ad litem seems to concede that the State may control the administration of the Cape lands if such control 'does not restrict any of the Rights of Common'. But how can control or administration of such lands exist at all if the exercise of such rights of common is not to be controlled or regulated?

"The necessary consequence of the consideration above set forth is, it seems to me, that the rights of common created by the Warner grant are public or collective in their nature and not individual, and, if not enforceable only through governmental authority, are certainly a proper subject of governmental control as constituting a species of charitable use or trust for the benefit of an indefinite group or class. Cf. State v. Griffith, 2 Del. Ch. 392, 409. The term 'commons' or 'common lands' has been frequently applied to lands dedicated to public use for recreation or similar purposes, 3 Tiffany, Real Property, Sec. 934; and the rights created by the Warner grant, so far as concerns their unrestricted nature, are somewhat similar. The right of public authority to regulate the use of such land is unquestioned.

"In this State the history of New Castle Commons is instructive, and certain litigation relating thereto affords a persuasive precedent for the decision of the case at bar. The facts appear in the case of Trustees of New Castle Common v. Megginson, supra, which presented the question whether the common lands were exempt from taxation as the property of a corporation for charitable uses. It appears that in 1701 William Penn issued the following warrant:

" 'William Penn, Proprietary and Govr. of the Province of Pennsylvania and Counties annexed.
Pennsylvania
　　(L.S.

" 'For the accommodation of the Inhabitants of the town of New Castle These are to require thee forthwith to survey or cause to be surveyed to the only use and behoof of the said Inhabitants to lie in Common one thousand acres of Land adjoining or near to the said Town hitherto reputed called New Castle Common in one convenient Tract, and if there proved more than the sd. number of Acres lay out the residue in one convenient piece to me and for my use and make returne thereof into my Secretary's office. Given under my hand and seal at New Castle the 31st day of 8ber 1701.

" 'Wm. Penn.'

" 'To Edward Pennington, Surveyor General of the Province of Pennsylvania and Territories.'

"The tract was thereafter duly surveyed. Nevertheless the lack of any supervision or control over such common lands tended, apparently, to be destructive of the purposes of the grant, for in 1764 the then proprietaries executed and delivered a charter appointing thirteen trustees as a body corporate to hold the lands for the use of the inhabitants of New Castle as a common forever. This charter recited in part:

" '* * * that in pursuance of said warrant of said William Penn, there was surveyed and laid out on the tenth day of April, A.D. 1704, to the inhabitants of the town of New Castle in the County of New Castle, a tract or parcel of land adjoining or near to the said town containing 1068 acres, as and for a common, for the use, behoof and accommodation of the inhabitants of said town of New Castle; that the inhabitants of said town had represented to said Proprietaries and Governors that, notwithstanding said warrant and survey and the many benefits and advantages the said William Penn had intended the inhabitants of said town should reap and enjoy great quantities of said land, surveyed as a common, had been enclosed by the owners of tracts of land lying contiguous thereto and by them tilled and cultivated and that the said inhabitants were remediless for want of legal power to sue and implead the wrongdoers; and that the said inhabitants had requested the said Proprietaries and Governors to incorporate a certain number of them and give them perpetual succession and confirmed to them the said tract of land in common for the use of all the inhabitants of the said town, * * *.'

"Now, I do not see how it could be suggested that the charter of the Proprietaries was an 'encroachment' upon the rights granted to the inhabitants of New Castle

by the warrant of 1701. It is true that the Penn warrant contained no specific grant to take timber, feed or other produce of the common; but in respect of lack of an administrative body to safeguard the enjoyment of the rights granted, the situation developing in the two cases was the same. See the Act of January 24, 1799, which is entitled: 'An Act to prevent trespasses being committed on the lands on the north east side of Lewes Creek, called the Cape, in the County of Sussex.'

"Upon the question whether the New Castle Commons was the subject of a charitable trust, the Supreme Court of Delaware held that the revenues received by the Trustees had been devoted to municipal public purposes, and said (though not deeming this fact controlling) that the actual uses to which the revenue had been put 'were those which distinctly belong to charitable uses.' 1 Boyce [376] 24 Del. 376 (77 A. 571, Ann. Cas.1914A, 1207). Finally, the Court held as follows: 'The conclusion of this court, therefore, is that the gift by William Penn of the land in question constituted a charitable use or trust, and that that land held and owned by the defendant, a corporation created for the purpose of administering that trust, was real property belonging to a corporation for charitable uses, and therefore exempt from taxation for public purposes.'

[redacted] "I am of opinion that the holding of the Supreme Court in the Megginson case is applicable here, and that the Warner grant of 1682, creating unrestricted rights of common in the inhabitants of the Town of Lewes and of Sussex County, constituted a species of charitable use or trust. The very uncertainty of the grant, both in respect of the extent of the rights granted and the ascertainment of the individual beneficiaries, is an essential characteristic of such a trust. State v. Griffith, supra. If this conclusion be sound, it follows without question that the administration of the trust is under the plenary control of the sovereign in the exercise of its powers as parens patriae. Charitable uses form one of the well-known instances of the exercise of such power. See concurring opinion of Taney, C. J., in Fontain v. Ravenel, 17 How. 369, at page 392, 15 L.Ed. 80, in which he says: 'But the power which the chancellor exercises over donations to charitable uses, so far as it differs from the power he exercises in other cases of trust, does not belong to the court of chancery as a court of equity, nor is it a part of its judicial power and jurisdiction. It is a branch of the prerogative power of the king as parens patriœ, which he exercises by the chancellor.'

"Holding that the Federal Courts, sitting in equity, exercise only judicial powers, he further says (17 How. at page 393, 15 L.Ed. 80): 'These prerogative powers which belong to the sovereign as parens patriœ, remain with the states.'

"I am accordingly further of the opinion that the series of legislative acts, including the existing statute vesting jurisdiction over the Cape lands in the Commissioners of Lewes, were enacted by the General Assembly in the exercise of its power as parens patriœ, and are (subject to the further objections now to be considered) valid and constitutional.

"The two remaining points bearing on the conclusion just reached now require discussion.

"(b) The apparent limitation of the beneficiaries of the Warner grant. It is to be noted that originally, from 1814 to 1841 (Acts of February 15, 1814 and February 20, 1837), the net rents from the lands were paid over to the County Treasurer 'for the use of the County of Sussex only'. From 1841 to 1857 (Acts of February 19, 1841, and February 3, 1847), one-third of the revenues from the Cape lands were applied to drain the marsh and two-thirds to the making of a canal to improve the navigation of Lewes Creek.

"It has already been pointed out that the Acts of 1841 and 1847 referred to the Cape lands as belonging to the State of Delaware. This error (if it be such) was sought to be corrected by the amendatory Act of February 15, 1849, which, however, in referring to the ownership of the lands substituted the phrase 'the inhabitants of the Town of Lewes, *in* the County of Sussex.' The Warner grant is for the use of 'the Inhabitants of the Town of Lewis *and* County of Sussex.' (Emphasis supplied.)

"Under the Act of March 2, 1857, the revenues are to be applied to various public purposes within and near Lewes; by the Act of August 10, 1864, and the act of which it is amendatory, they are to be expended upon 'public improvements about Lewistown'; and by the Act of March 2, 1871, and all subsequent acts down to the present time, they are to be applied 'to such

improvements of the Town of Lewes as they [the Commissioners] may deem proper.'

"It thus appears that whereas in the earlier days of administering these public lands the revenues were devoted to Sussex County, for the last 70 years, at least, they have been used solely for the benefit of one group only of the two specified in the Warner grant, viz., the inhabitants of Lewes.

"What bearing has this fact upon the issues in the instant case? I cannot see that it has any relevancy whatever. Possibly what has happened is that the General Assembly, faced, first, with a question of construing a curiously worded grant,[26] and second, with a possible problem of apportionment of revenues which, originally at least, must have been very small, determined that the most effective and convenient way to deal with these questions was to confide the administration of this public trust to the municipality most nearly concerned, viz., the Town of Lewes, and to direct the application of its revenues to the public purposes of that municipality.

■ "But we are not required to speculate upon the matter. Whether the administrative provisions of the various legislative acts embody such a substantial departure from the original terms of the trust, either because of the unjustified exclusion from its benefits of the inhabitants of Sussex County residing elsewhere than in Lewes, or because of unjustified prohibitions or restrictions upon the use of the lands by the public, and whether, if so, the Attorney General, as representing the beneficiaries of a charitable use, may have relief therefrom in a Court having jurisdiction of the administration of the trust (if such there be), I do not attempt to say. As I view the case, these are questions with which this Court is not concerned. The issue before this Court, as I understand it, is simply this: How stands the title to the land? The determination of the questions above suggested can throw no light upon the question of title. If the general conclusion above reached be correct, viz., that the General Assembly has power to appoint trustees to manage and care for the Cape lands as the subject of

a charitable trust, it can, of course, choose the trustee; and since it has chosen the Town of Lewes for that purpose, it necessarily follows that this Court is required to give recognition to the trustee so appointed.

"Questions relating to the administration of the trust and the disposition of the income therefrom do not, in my opinion, affect the standing of the Town of Lewes, as such trustee, before this Court. Accordingly, such questions will not be further considered."

6. A substantial portion of the Wilson Report is devoted to discussion of Delaware's failure to keep the original right of commons for the benefit of the inhabitants of Sussex County. Wilson suggests that since 1796 no court action or legal steps have been taken to establish the claim of the general public in the Cape lands. He suggests that large sections of the Cape lands have come into the possession of private individuals, corporations and certain public agencies, whose possession is, of necessity, opposed to the claim that the lands are public common.

He shows that about 150 years ago the inhabitants of the county were opposed to certain legislative action which established a land office for the sale of all vacant and uncultivated lands in Delaware insofar as it touched the Cape lands. Act of 1793 (2 Laws of Delaware 1160). This statute provided procedures for persons desiring to take up vacant land within the state; and whenever differing claims arose a caveat could be entered before the recorder of deeds. An administrative agency then denominated as a board of commissioners was created to hear disputes, with appeal to the Supreme Court. On February 7, 1794 (2 Laws of Delaware 1174), the statute was again amended. Any patents or ancient warrants and grants made by James, Duke of York, to the proprietaries in Maryland and Delaware, at any time prior to January 1, 1760, were deemed to be valid in law. The amendment also provided for appeal from the Board of Commissioners to the High Court of Errors and Appeals. This court was created by the Constitution of the State of Delaware, done in convention on June 12, 1792 (1 Laws of Delaware 44). On February 9, 1796 the

---

[26] "I say 'curiously worded', because if the grant is to be for the benefit of the inhabitants of the whole County, why specify Lewes at all? Of course, the sparsely-settled condition of the County at the time might well have led the draftsmen unconsciously to think of the two groups as one."

statute was again amended (2 Laws of Delaware 1292). And by the Act of January 11, 1798 (3 Laws of Delaware 3) it became unlawful for the recorder of deeds of any county to thereafter issue any warrant for the survey and location of any lands whatever. By the Act of February 2, 1807 (4 Laws of Delaware 86), all general warrants issued by the recorder of deeds of Sussex County after June 19, 1793 and prior to January 11, 1798, were declared valid. By the Act of January 23, 1843 (9 Laws of Delaware 454) (1) all general warrants issued by the recorders of the several counties not specifying the lands intended to be surveyed or located were vacated, (2) continued, uninterrupted, and peaceful possession of any lands for the space of 20 years would enure as a complete bar to any claim of title on the part of the state to said lands, and (3) whenever any woodland, meadow land, or marsh land, to which the state otherwise would have had title, which had been held in common, by two or more persons, in uninterrupted possession for 20 years, then any of the parties interested could petition the Chancellor of Delaware to have the lands partitioned in the same manner as partition of lands held in joint tenancy and not in common. This seems to be the original act providing for adverse possession against the state.

Wilson reports that after the Act of 1793 (2 Laws of Delaware 1160), as amended by the Act of February 7, 1794 (2 Laws of Delaware 1174), a recorder of deeds of Sussex County issued a land warrant to Nicholas Ridgely, Theodore Wilson, Rhoads Shankland, Jr., and Thomas Marsh for a parcel of vacant land (not exceeding 200 acres) lying between Lewes and Rehoboth Hundred. On the same day the recorder issued a similar warrant to William Russell for vacant land not exceeding 200 acres. The next day, June 16, 1796, a like warrant was issued to William Perry, Peter and John Marsh for a similar piece of land; and, on June 21, 1796, another similar warrant was issued to a William Coleman. These lands, it would appear, formed a part of Cape Henlopen. The Perry and Ridgely mentioned were, at the time, practicing attorneys. Ridgely afterwards became Chancellor.

Caveats were filed by Caleb Rodney (afterwards Governor of Delaware) against the returns upon the warrants issued to Ridgely et al. These caveats were continued from time to time; but on July 19, 1797, the one against Russell was heard and the Commissioners did "order, judge and decree that agreeable to the laws of the State of Delaware, it is considered that the said Russell take nothing by his said warrant, and that the said William Russell shall not be permitted to hold the land contained in his said survey." We are not told the reason for the decision. Appeal was taken to the High Court of Errors and Appeals. The recorded history of this litigation is, however, lost. The case is not found in Delaware Cases 1792–1830, supra. Here, Wilson suggests the reason for the continuance on the other caveats was because the parties might possibly have agreed to make the original Russell warrant the test case. If this be so, it appears the High Court of Errors and Appeals had reversed the finding of the Commissioners, because the Caveat Docket shows that, on April 21, 1829, the caveats previously filed against Ridgely, Wilson, Shankland, Marsh, Perry, Coleman and Peter and John Marsh were "struck off by order of the Board [of Commissioners]."

Wilson suggests the High Court of Errors and Appeals had affirmed the Commissioners' holding in the Russell case. He refers to a petition executed by 69 citizens of the Town of Lewes to the Senate and House of Representatives of the Delaware General Assembly, dated January 6, 1817. See Wilson's Report, Part III, Exhibit AN. Wilson concludes this petition shows the rights of common created by the original grant of 1682 were considered valid as late as 1817 and that the citizens of the Town of Lewes challenged the right of any individual to become possessed of any of the Cape lands free of the right of common. He points out that four of the subscribers, at one time or another, were Governors of the State of Delaware; and he insists that it is unlikely that men of this type would have lightly executed the petition, which reads:

"The Petition of the Subscribers, Citizens of Lewes, respectfully represents:

"That the lands and Marshes on the North East side of Lewes Creek called 'Cape Henlopen' were granted to them as a Common in the year 1682 the validity of which was not questioned until after the passage of 'An Act to Open and Establish a Land Office' in the year 1793. Soon after said Act was passed six or

eight of the most influential men of the County, among whom were two lawyers, procured Land Warrants & laid them on said lands & marshes, these warrants were Caveated by the Inhabitants and decisions were had before the Board of Commissioners, the Supreme Court, and the High Court of Errors and Appeals, all of which established the validity of the Grant to the inhabitants as a Common. In this Grant an indefeasible Right to the timber & feed is given to the Inhabitants as Commoners. Notwithstanding the rights of your Petitioners has been thus established and at a considerable expense in carrying on the Law suits for the protection of those rights, yet they perceive with regret a Law passed Feby 15th, 1814, intitled 'An Act Authorizing the Court of General Sessions of the Peace & Gaol delivery of the State of Delaware to appoint Trustees to take charge of and secure the rents of the Land and Marsh commonly called Cape Henlopen for the use of the County of Sussex' which prohibits them from the enjoyment of their rights of Common in the afs'd Lands & Marshes.

"Your Petitioners believe that exclusively of their Constitutional rights in Common with all other citizens to the protection of their property, that the Law above recited has had no beneficial effect whatsoever, while on the other hand it makes a Sinecure for three Trustees, Subjects innocent individuals to the expense and trouble of carrying on Lawsuits in defense of their just Rights while those suits are carried on against them at the public expense, and violates two great principles of Constitutional and natural rights by preventing people from using their rights as commoners, and by making it penal to turn out cattle to Roam over & feed on a place which has no enclosure.

"Your Petitioners therefore pray your Honours to Repeal the Act above recited that was passed Feby. 15th, 1814. Lewes Jany. 6th, 1817."

Apparently the petition had little, if any, effect for the legislature proceeded on its course for over the next hundred years practically regulating the right of common out of existence. See footnote 22, supra.

Wilson was unable to find what happened to the estate or license of Edmond Warner. Apparently, he never executed any deed, bill of sale, or assignment pertaining to the lands, and left no will wherein he attempted to dispose of his interests. In commencing Part IV of his report, Wilson writes: "Should the reader or a court of competent jurisdiction find it impossible to relegate the conflict at all points, as a broad general statement it may be said that the municipal governing body of the town [of Lewes], as well as those claiming by, through and under it, have one strong point in their favor. With untiring effort and a rather high degree of skill they have practiced the old adage that, if an untruth is repeated often enough, or a false position is assumed long enough, there is every chance that such untruth might be accepted at its face value and such false position might be recognized as sound."

With respect to the legislative acts found in footnote 22, supra, Wilson states that four factors should be considered: (1) That the early acts of the legislature carefully divorced any measure of control of the Cape lands from the Town of Lewes; (2) that from an early date the Town endeavored to gain legislative recognition of its claim to control these lands; (3) that the Town, after a hundred years of effort, succeeded in obtaining complete legislative recognition of its claim; and (4) that the Town, as well as those claiming under it, have never received judicial sanction for the control which has been delegated to it by the Delaware legislature. See Wilson's Report, Part IV, pp. 71–104, for the author's discussion of legislation other than that referred to in footnote 22, supra, dealing with the control of the Town of Lewes over the Cape and marsh lands.

The Delaware courts have never come in contact with the question sub judice. However, in four Delaware cases, they have approached the periphery of the problem. In Lewes Sand Co. v. Commissioners of Lewes et al., 22 Del.Ch. 21, 191 A. 821, and in Lewes Sand Co. v. Graves et al., 1 Terry, 189, 40 Del. 189, 8 A.2d 21, 22, the Court was concerned with certain "Lewes leases". In the first case the complainant sought to enjoin the Commissioners of Lewes from granting to Graves a lease of a portion of a sand hill located on the "Common or Cape" at Lewes, with the privilege of taking sand therefrom. The Chancellor did not pass on the question of the power of the Commissioners to grant an exclusive right for the taking of the sand. In fact, the question was not before the Chancellor. He said (191 A. at page 821): "It will be assumed, without deciding, that the Com-

missioners have the power to grant such an exclusive right as the complainant alleges was granted to it." It is clear from a reading of the case, as well as from the record and pleadings, that the question before the court was a limited one.

In the second case an action of trespass was brought by Graves against the Lewes Sand Co. for digging sand within an area formerly leased to Graves. Lewes Sand Co. defended its right on a certain reservation that it would have "the privilege or right to use, sell, ship or deliver sand from the Sand Hill"; and that Graves took his lease subject to the reservation. It should be particularly noted that in the course of the Court's opinion, Judge Rodney said: "The State of Delaware held a large tract of vacant land contiguous to the Town of Lewes and reaching to the seashore, on which land are large deposits of sand in the form of sand hills or sand dunes;" and, in his concurring opinion, the present Chief Justice of Delaware said: "The lands in question, belonging to the State with a certain jurisdiction of them vested by statute in the municipality of Lewes, contain large deposits of sand in the form of hills or dunes." These are the only two recent Delaware cases where the courts have intimated that the Cape or marsh lands belong to the State of Delaware with a certain delegated administrative function running to the Town of Lewes.

Two early Delaware cases, however, seem to have approved the first Land Office Acts. In Teagles' Lessees v. Waller, 1797, 1 Del. Cases 132, the Act of February 7, 1794 (2 Laws of Delaware 1174, 1175) was recognized as valid by the Supreme Court of Delaware. This was an ejectment action. From the scanty report (Wilson's Red Book 155) it is impossible to discover whether the questions raised in the case at bar were argued there. The precise holding of the case is that title to lands taken under a warrant issued pursuant to the Act of February 7, 1794, is good. The Court said (1 Del. Cases at page 133): "Plaintiff originates his title with a patent granted by this state, which is founded upon Acts of Assembly (2 Del. Laws 1175), which plaintiff says he has complied with. Plaintiff has also shown the foundation of his title, which he says satisfied the commissioners with regard to it. He has shown as a part of it a sheriff's deed under judgment and execution against defendant. The Court think the plaintiff's title good, and it

is incumbent on defendant to show the Delaware Acts did not attach upon these lands, and that they were not sufficient to authorize the issuing of the patent." As stated, nothing in the case discloses whether the lands in question were part of the Cape lands.

The year before the High Court of Errors and Appeals in Wright v. Scotten, 1796, 1 Del. Cases 403 (Bayard's Notebook 148 and Wilson's Red Book III) decided that where a person was in possession of a warrant at the time of the passage of the Act of February 7, 1794, and nothing had occurred to void the grant, he was entitled to a patent from the Land Office. The case is obviously inapposite to the questions presented here, as it involved warrants issued from the proprietary of Maryland, dated February 11, 1759, and from the proprietary of Pennsylvania on December 3, 1734; and the lands in question lay on the borders of Maryland and Delaware.

Power to control and administer the Cape lands vested by the Delaware legislature in the Commissioners of Lewes would seem subject to the condition that such authorizations should be exercised in such a manner so as not to eradicate the original rights of common. Yet the State, as owner of the fee, can delegate to the Commissioners of Lewes or to any other state agency the duty of administering public and vacant lands subject to a charitable trust. However, as the Special Master points out, the question here is not whether there has been a breach of a charitable trust with the attendant and troublesome question of whether there should be a resulting trust or whether the inhabitants of Sussex County have the present right to seek court or legislative protection of their right of common. These and allied questions will be discussed later.

7. In disposing of another contention of the trustee ad litem, the Special Master proceeded:

"(c) The enforceability and constitutionality of the Act of May 21, 1941. It is contended by the Trustee ad litem that the description of certain lands referred to in the present town charter of Lewes (Act of May 21, 1941) is so vague that 'it is not possible to determine the territory outside the corporate limits of the Town of Lewes over which the Commissioners of Lewes were given jurisdiction * * *.'

"The description, the certainty of which is thus assailed, is that relating to the so-called 'vested lands' of the Town of Lewes. No criticism is made of the description relating to the Cape lands generally, although the latter would seem the more vulnerable to such attack.

"It will be recalled that since 1871 the Commissioners of Lewes have been given 'full and exclusive authority and control over the Great and Beach Marshes, Cape and Cape Marshes, near Lewes'. Since that date the Commissioners have also had jurisdiction over certain public lands called 'vested lands'. At first these comprised only public and vacant lands within the Town; but beginning with the charter of 1907, such jurisdiction was extended beyond the Town limits.

"The present charter provision (Act of May 21, 1941, Sec. 9), respecting jurisdiction over the 'vested lands', is, so far as here pertinent, as follows: 'All the public and vacant lands lying within the corporate limits of said town of Lewes, and all the public or vacant lands contiguous to but outside the corporate limits of said town and fronting on the Bay between the point of Cape Henlopen on the south and Veasey's Inlet on the north, shall be vested in the Commissioners of Lewes, and the said Commissioners shall have jurisdiction over the same; * * *.'

"The provision conferring general jurisdiction over the Cape lands, which also confers certain additional powers over the 'vested lands', is as follows: 'The said Commissioners of Lewes are hereby invested with full and exclusive authority and control over the Great and Beach Marshes, Cape and Cape Marshes, near Lewes, and may sell and dispose of the grass and hay thereof in the month of July in each and every year, at public sale, giving notice by printed advertisements, posted in five of the most public places in Lewes and Rehoboth Hundred ten days before the day of sale, to the highest and best bidder or bidders for the same; the notices shall specify the place where and the time when the grass or hay will be sold; the said Commissioners are further authorized to sell sand and gravel by measure or otherwise, as may be deemed by the Commissioners to be to the best interests of the town, wherever such sand and gravel may be located within the limits of the vested lands of the Town of Lewes; * * *.'

"The reason for the existence in the charter of two separate provisions for jurisdiction over the lands contiguous to or near the Town does not appear in the record, nor is it discussed in the briefs. The two provisions appear to be overlapping. It would seem, however, from the latter provision above quoted that the authority of the Commissioners to sell sand and gravel might depend upon the validity of the provision relating to the 'vested lands'; and accordingly the validity of certain of the leases here involved (e.g., Exs. 5 and 6) might be doubted if such provision be void for unintelligibility or vagueness.

"The description complained of is quoted above. It has been a part of the town charter since 1907—during a period of 36 years. As I read the brief of the trustee ad litem, three reasons are assigned in support of the contention that the description is so vague as to convey nothing; first, that no quantity of land is specified; second, that Veasey's inlet is southwest, not north, from Cape Henlopen; and third, that no southerly boundary is fixed.

"The rule of uncertainty applicable in cases of statutory construction is stated in Crawford, Statutory Construction, Sec. 198, as follows: '§ 198. Statutes. Without Meaning—Indefinite Terms.—We have seen that awkward, ungrammatical, inaccurate and inapt expressions will not generally of themselves vitiate a statute, if the court, by the process of interpretation, can ascertain with reasonable certainty what the legislature meant. Nevertheless, a statute to be valid must be capable of construction; that is, it must have an ascertainable intelligible meaning. If the statute cannot be given an intelligible meaning, because of the uncertainty, indefiniteness and vagueness of its terms, it will be wholly inoperative. But the court must first resort to and use every authorized means in its attempt to ascertain that meaning, although, of course, it cannot supply a meaning where the language is susceptible of none. If there is no indication of the intention of the legislature, obviously, it will be impossible for the court to discover one or make it effective. In some instances, however, indefinite general terms, if preceded by specific terms, may be rendered definite and hence operative by the doctrine of ejusdem generis.'

"The general rule of certainty applicable to a description of land contained in a

deed is thus stated in Thompson on Real Property, Vol. 4, Secs. 3073 and 3074: '§ 3073. Requisite that land shall be identified with reasonable certainty.—The first requisite of an adequate description is that land shall be identified with reasonable certainty, but the degree of certainty required is always qualified by the application of the rule that that is certain which can be made certain. A deed will not be declared void for uncertainty if it is possible, by any reasonable rules of construction, to ascertain from the description, aided by extrinsic evidence, what property it was intended to convey. "The law will not declare the instrument void for uncertainty until it has been examined with all the light which contemporaneous facts may furnish. If these render the intention clear and the words of the instrument are, by fair rendering, susceptible of a construction to uphold such intention, then they will be so construed and the instrument enforced." It is only when it remains a matter of conjecture what property was intended to be conveyed, after resorting to such extrinsic evidence as is admissible, that the deed will be held void for uncertainty in the description of parcels.

" '§ 3074. Office of description to furnish means of identification of land.—The office of a description is not to identify the land, but to furnish the means of identification. Hence, a description which furnishes the means of identifying the land is sufficient. It is not essential that the deed contain such description as will enable the identification to be made without the aid of extrinsic facts. The description will be liberally construed to afford the basis of a valid grant. * * *'

"Whether or not the degree of certainty requisite for a description of land in a deed is also requisite for such description in a statute need not be considered. Tested by either of the above standards, the description of the vested lands seems adequate.

Surely failure to specify a number of acres is of no consequence. The lands are identified as 'public and vacant lands' (not public or vacant lands, as counsel appears to suggest); as contiguous to the corporate limits; and as fronting on the Bay between Cape Henlopen and Veasey's Inlet. The error in compass direction I think of no moment. As counsel for the Town correctly observe, the eastern shore line of the United States runs in a generally north-south direction; and an error of this sort is readily understood. There is no doubt about the actual location of either Cape Henlopen or Veasey's Inlet. (Wilson's Report, Part IV, p. 104)

"It is true that the southern boundary of the lands under the Town jurisdiction is not fixed in the charter. Apparently, however, such southern boundary has, since the year 1926, been accepted by the State Highway Department and the Town of Lewes as coinciding with a line surveyed by Mr. Thomas B. Pepper for the Department, pursuant to its duty to survey public lands within its jurisdiction, and appearing on plots of such lands, recorded in the office of the Recorder of Sussex County. Wilson's Report, Part VII, pp. 135–136). This matter of the boundaries of the State Highway Department jurisdiction and the jurisdiction of the Town of Lewes is further dealt with hereafter; it is sufficient for the present purpose to show that an actual line, apparently acceptable to both bodies, has been adopted as the southerly boundary of the Town jurisdiction, and all uncertainty of boundary thereby removed.[26a]

"I conclude that the description of the 'Vested lands' is not void for uncertainty.

"It is also contended by the trustee ad litem that the Act of May 21, 1941, is void as violative of Article II, Section 16, of the Constitution of Delaware,[27] which reads as follows: 'No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more

---

26a Since the filing of the Special Master's report, C. J. Killoran, present Attorney General of Delaware, has advised the court that the Chief Engineer of the State Highway Department has discovered certain map data which indicates that approximately 225 acres of the land condemned lies to the south of the "Pepper Line" and belongs to the State of Delaware. As the parties have indicated they are willing to stipulate with respect to this new evidence, it can have no bearing on the legal findings made in this opinion. The rights of the parties and questions as to the quantum of land taken will be provided for in the final judgment. The statements in footnote 28 are to be read in accordance with this newly discovered material.

27 For Delaware cases on the point, see State v. Danberg, 1 Terry, 136, 40 Del. 136, 6 A.2d 596; In re Cypress Farms Ditch, 7 W.W.Harr. 71, 37 Del. 71, 180 A. 536; Baxter v. State, 9 W.W.Harr.

than one subject, which shall be expressed in its title.'

"The title of the Act is 'An Act to Reincorporate the Town of Lewes.' (Vol. 43 Laws of Del. c. 170, p. 723)

"It is argued by the trustee ad litem, that the effect of the provisions of the Act conferring jurisdiction upon the Town of Lewes over territory not embraced within the corporate limits is to inject into the Act a subject not germane to the general subject of incorporation. No authority is cited to support this contention. It is clearly without merit. The title gives notice that the bill may contain any provision that is germane to the charter of a municipal corporation, and therefore may contain any powers that it is customary to confer on municipalities. The practice of conferring upon cities and towns territorial jurisdiction beyond the corporate boundaries is well settled. 43 C.J. 235; 2 Dillon, Mun.Corpns., 5th Ed., § 775. In the case of the Town of Lewes it has existed for more than 70 years. I think that the provisions complained of are germane to the general subject matter of the Act; that the title fairly expresses such subject matter; and that therefore the Act does not contravene the constitutional provision set forth."

8. The court affirms the Special Master's disposition of the claim of the Trustee ad litem that the Act of April 18, 1929 (36 Laws of Delaware, c. 2, p. 4), dealing with the public and vacant lands of Delaware, transferred to the State Highway Department jurisdiction over the Cape lands. In treating this particular contention, the Special Master commenced with the Act of March 29, 1907 (24 Laws of Delaware, c. 12, p. 22). He shows it created a commission to locate and survey the lands of Delaware between Maryland on the south and Cape Henlopen on the north "designating such lands as are now claimed by any persons and such lands as are now occupied and enclosed." This statute fails to disclose any legislative intent to divest the Commissioners of the Town of Lewes of their jurisdiction over the Cape lands, given them under the Act of March 7, 1901. See, footnote 22j, supra. The Special Master discarded the Act of April 2, 1913 (27 Laws of Delaware, c. 5,

p. 9) creating a Public Lands Commission to survey and plot public lands in the state. That statute empowered the Commissioners and the Governor to give a deed for any part of the public lands of the state of fifty acres or less. The Commissioners were also given authority to supervise the sale of any material product, such as hay, which could grow on the land. Difficult, indeed, it is to find that by this statute the Commission created thereunder was given jurisdiction over the Cape lands—unless, of course, all these statutes were intended to repeal by implication. The Act of April 11, 1907 (See footnote 22k), reincorporating the Town of Lewes is a specific or local statute. The several statutes just mentioned are general laws operating over every part of the state. A specific statute applying to a particular locality is not to be considered repealed by a statute general by its terms and application, unless the intention of the legislature to repeal or alter the special statute is manifest. Lewis Sutherland, Statutory Construction, Vol. 1, p. 526.

The Special Master was unable to conclude that, in view of the continued jurisdiction of the Town of Lewes over the Cape lands, the 1907 or 1913 statutes were intended to effect a radical change in the supervision of the special trusts or uses created by the Warner Grant. His view is fortified by the absence of any provisions in the acts creating the Public Land Commission for delivery by the Town of Lewes of all evidence of leases and sales made by the Commissioners. Likewise there are no statutory provisions for the utilization of existing revenues, which would naturally arise out of past but still active leases executed by the Commissioners. The legislature has specifically directed the use of these revenues—if only partly consistent with the purposes of the Warner Grant—for over a century, and it is highly unlikely that in creating such an important agency as the State Public Land Commission the legislature would remain silent on the disposition of such revenues, or leave it to conjecture whether the Town Commissioners were still to receive revenues from past leases but not from new ones.

Subsequent legislative history demonstrates that by the Act of April 2, 1925 (See footnote 22l), the charter of Lewes was

223, 39 Del. 223, 197 A. 678; Wilmington Trust Co. v. Highfield, 4 W.W.Harr. 394, 34 Del. 394, 153 A. 864; Equitable

Guaranty & Trust Co. v. Donahoe, 3 Pennewill, 191, 19 Del. 191, 49 A. 372.

again amended to authorize the town to sell sand and gravel. This authorization manifestly continued jurisdiction over the "Cape and Cape Marshes". At this point the Special Master directed a pungent question. He asked: "Now, can it be reasonably supposed that the intent of the General Assembly was to confer jurisdiction over such lands upon the Town of Lewes from 1871 to 1913; upon the State Highway Department from 1913 to 1925; and again upon the Town of Lewes after 1925? Such a conclusion, without any express language to compel it and without any reason to support it, seems wholly unacceptable." The Special Master's question and answer explodes this particular argument of the Trustee ad litem.

9. The trustee ad litem rests his last attack on the Act of April 18, 1929 (36 Laws of Delaware c. 2, p. 4). This Act—Sec. 1—provides: "On and after July 1, 1929, the Public Lands of the State of Delaware, as ascertained in regard to location, surveyed and plotted under the supervision and direction of the Public Lands Commission, created in accordance with the provisions of Chapter 5, Volume 27, Laws of Delaware, shall be under the supervision and control of the State Highway Department, which Department is hereby authorized and empowered to care for the said Public Lands and all powers given to said Public Lands Commission shall thereafter be exercised by the said Department." By this statute the new agency is empowered to take jurisdiction over those lands which have been ascertained, surveyed and plotted. The Cape lands were never such. As far as the record discloses, the State Highway Department has made no attempt to plot or survey *any of the lands here in suit*.[28] Again the court affirms the Special Master that neither the Act of April 18, 1929, nor

any of the others discussed immediately above, dealing with the public lands of Delaware, effected any transfer of jurisdiction over the Cape lands to the agencies in such acts mentioned.[29]

 10. The claim of the Town of Lewes that the State of Delaware has for a period of over 150 years asserted claims adverse to any rights of common found in the Warner Grant is not based on an actual adverse possession for there is no evidence here on this question. At most, reliance is had on the legislation already discussed to show that control has been in the town's Commissioners and its lessees. While this may have the semblance of a "legal adverse possession" it is not such an adverse possession as is known in the law, in the absence of factual and definitive evidence. As to this the Special Master said: "The action of the General Assembly in confiding to trustees or commissioners, or to the municipality of Lewes, the administration of the use or trust created by the Warner Grant is not hostile or adverse to rights of the beneficiaries of the grant, and the possession or control enjoyed thereunder cannot afford any support to the claim that a title by adverse possession has thereby been acquired. Whether any individual beneficiary or group of beneficiaries has, by laches or otherwise, lost any right (if any such right exist) to object to the administration of the trust or the disposition of its revenues, is, as before pointed out, a question with which this Court is not concerned."

 11. The many facts and arguments of counsel have been summarized and great portions of the Special Master's comprehensive report have been quoted at large mainly for the benefit of the students of our local history. But, the decision in the instant case must deal with the narrow

---

[28] The survey and plot directed to be made by the Act of April 2, 1913 (see footnote 22 supra) was actually made in 1926 by one Thomas B. Pepper, surveyor for the Commission. See Wilson's Report, Part VII. pp. 134–5. As recorded in the Recorder's Office in Sussex County, the plot shows that a definite line north of Rehoboth, which the parties conceded to be the "Pepper line", and all the condemned lands lie north of this line, i. e., that line is to be accepted as the southerly boundary of the Town of Lewes' jurisdiction. See note 26a, supra.

[29] By the Act of May 11, 1937 (41 Laws of Delaware, c. 259, p. 781), the State Park Commission was created. This Commission is authorized to establish state parks on any portion of the lands in Sussex County bordering on the Atlantic Ocean. The Commission, after making a survey, filed its report with the State Highway Department, but was careful to point out that there was apparently some dispute as to the jurisdiction over the lands comprising Cape Henlopen and, until that dispute was determined, it was not recommended that a park site be established on the Cape lands.

question of title. The court finds the fee title in the State of Delaware. As the Delaware legislature, and it alone, may delegate the administration of the charitable use—if such it is—created by the Warner Grant, to the Commissioners of the Town of Lewes, the various lessees have a legal compensatory interest in these proceedings. However, there is, at this time, no apposite statutory authority running to the Commissioners of Lewes directing how they may manage the cash award which will ultimately be found due from the government in this proceeding. If a true charitable trust exists here, its corpus has been transmuted from real property into cash. Whether there has been and is a failure of the original purposes of the Warner Grant, with resultant questions of the application of the doctrine of cy pres,[30] or an extinguishment of the uses once created with escheat to the State, or whether there has been a resulting trust in favor of William Penn's devisees or heirs, or whether, on behalf of the inhabitants of the Town of Lewes and Sussex County, the Commissioners of Lewes will be required, either alone or with the assistance of the present Attorney General, to apply to the proper state court for instructions in carrying out their statutory trustee duties, or whether they shall be required to supplicate the legislature for specific power to act as trustees for the final cash award to be paid eventually by the government here, are all matters with which this court has and can have no concern. These are exclusive matters which rest within the expert competence of the Delaware State Courts or that state's legislature, for regardless of what decision this court might attempt to make on any of the legal points discussed, its ruling can have no jural effect. Hence, the court must conclude that, with the exception of the lessees who are entitled to receive separate awards, the award finally to be paid for the taking of the 1,010.8 acres of land near Cape Henlopen must be paid over to the State of Delaware—not the Commissioners of the Town of Lewes—for such disposition as that State, its Courts or Legislature, may see fit to make.

■ 12. These views require merely slight modifications of the Special Master's findings of fact and conclusions of law. And while these proceedings are not subject to the application of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c (See Rule 81 (a) (7), it may prove helpful to make definite findings for as far as these proceedings have progressed. Hence, the court makes the following findings of fact:

1. Fee simple title to the condemned lands was, before the time of the taking thereof by the government, vested in the State of Delaware, subject to a certain charitable use or trust for the benefit of the inhabitants of the Town of Lewes and County of Sussex, created by a certain proprietary grant of the Court for the County of Sussex, made at sessions thereof held on January 9, 10 and 11, 1682/3; the terms of which are set forth in Exhibit V to Part III of the Wilson Report.

2. Commissioners of Lewes, a municipal corporation of the State of Delaware, was at the time of the taking of the condemned lands and at all times from and after a date prior to the making of any leases hereinafter mentioned vested with full exclusive authority, control and jurisdiction over said lands, as trustee or agent designated by the State of Delaware in and by virtue of the Act of the General Assembly of the State of Delaware approved May 21, 1941 (43 Laws of Delaware c. 170, p. 723).

3. Cape Henlopen Surf Club, a Delaware corporation, was at the time of the taking of the condemned lands possessed of a valid leasehold interest in a certain portion thereof, for a certain term and under certain conditions and provisions, all as set forth in a certain agreement of lease dated June 20, 1939, in evidence as Exhibit 3.

4. Martin Black and Harry R. Draper were, at the time of the taking of the condemned lands, possessed of a valid leasehold interest to a certain portion thereof, for a certain term and under certain conditions and provisions, all as set forth in a certain agreement of lease dated May 29, 1940, in evidence as Exhibit 4.

5. Sussex Sand Company, a Delaware corporation, was, at the time of the taking of the condemned lands, possessed of a valid leasehold interest to a certain portion thereof, for a certain term and under certain conditions and provisions, all as set forth in a certain agreement of lease dated December 5, 1938, in evidence as Exhibit 5.

---

[30] The doctrine of cy pres has been rejected in Delaware. See Murphy v. Mc- Bride, 14 Del.Ch. 457, 130 A. 283; Doughten v. Vandever, 5 Del.Ch. 51.

6. Lewes Sand Company, a Delaware corporation, was, at the time of the taking of the condemned lands, possessed of a valid leasehold interest to a certain portion thereof, for a certain term and under certain conditions and provisions, all as set forth in a certain agreement of lease dated July 1, 1929, in evidence as Exhibit 6.

7. Lewes Sand Company, a Delaware corporation, was, at the time of the taking of the condemned lands, possessed of a valid leasehold interest to a certain portion thereof, for a certain term and under certain conditions and provisions, all as set forth in a certain agreement of lease dated February 15, 1937, in evidence as Exhibit 7.

8. Rehoboth Trust Company, a Delaware banking corporation, executor of the Estate of William T. Tappan, deceased, was, at the time of the taking of the condemned lands, possessed of a valid leasehold interest to a certain portion thereof, for a certain term and under certain conditions and provisions, all as set forth in an agreement of lease dated April 2, 1938, in evidence as Exhibit 8.

9. Mark T. McKee, at the time of the taking of the condemned lands, held a valid option in respect of the said leasehold interest of Lewes Sand Company dated July 1, 1929, as aforesaid; all as set forth in a certain agreement between the said Lewes Sand Company and the said Mark T. McKee dated May 19, 1930, in evidence as Exhibit 9, and in a certain deed from said Lewes Sand Company to the said Mark T. McKee, dated December 22, 1931, in evidence as Exhibit 10.

10. Sussex County, Delaware, as such, was not, at the time of the taking of the condemned lands, seized or possessed of any right, title or interest therein.

11. No person, firm or corporation other than the foregoing has asserted or maintained in this cause any right, title or interest in the condemned lands.

12. There is no evidence of the acquisition by the State of Delaware, Commissioners of Lewes, or any other person, firm or corporation, of any right, title or interest to the condemned lands or any part thereof by virtue of any possession or occupation hostile or adverse to the title or rights hereinabove found to exist. This results in the following conclusions of law:

1. The grant of the Court for the County of Sussex to Edmond Warner at a session thereof held on January 9, 10 and 11, 1682/3 (being Exhibit V to Part III of the Wilson Report), created a valid charitable use or trust in respect of the lands therein described for the benefit of the inhabitants of the Town of Lewes and County of Sussex.

2. The Warner Grant of a right of common for the benefit of the inhabitants of the Town of Lewes and County of Sussex is not a reservation from or exception to the grant to Edmond Warner, and its validity and effect are not to be determined by the rules of law respecting reservations and exceptions in deeds to real property.

3. The Warner Grant of a right of common for the benefit of the inhabitants of the Town of Lewes and County of Sussex is not void because for the benefit of an indefinite or fluctuating class of persons.

4. At and before the time of the making of the Warner Grant William Penn, as proprietary of the Counties of New Castle, Kent and Sussex, was seized and possessed of seignorial rights and powers of government over the lands of the said Counties.

5. The several Acts of the General Assembly of the State of Delaware relating to the control and administration of the "lands of the Cape" (whereof the condemned lands are a part), a list of which Acts appears in footnote 22, supra, were enacted in exercise of the powers of the General Assembly as parens patriae, and are valid and constitutional under the State Constitution.

6. The Act of the General Assembly of the State of Delaware approved May 21, 1941 (43 Laws of Delaware, c. 170, p. 723 et seq.), is not violative of the provisions of Sec. 16 of Art. II of the Constitution of the State of Delaware.

7. The description of the so-called "vested lands" contained in the said Act approved May 21, 1941, is not so vague or indefinite as to be meaningless or unenforceable.

8. None of the several Acts of the General Assembly of the State of Delaware relating to the public lands of the State, viz., the Act of March 29, 1907 (24 Laws of Delaware c. 12, p. 22); the Act of April 2, 1913 (27 Laws of Delaware, c. 5, p. 9); and the Act of April 18, 1929 (36 Laws of Delaware c. 2, p. 4), vested in or transferred to the State Highway Department

146

any jurisdiction or control over any of the condemned lands.

Unless otherwise noted, the report of the Special Master is affirmed, and the parties should begin to adopt procedures which will result in final awards for the lands and the interests therein taken.